## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

JAMES GARCIA,

     Plaintiff,

v.

CITY OF MONTE VISTA, COLORADO,
JOHN ROSECRANS, in his individual capacity,
MICHAEL MARTINEZ, in his individual capacity,
ROBERT WILLETT, in his individual capacity,
STEPHEN HUNZEKER, in his individual capacity,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff James Garcia, by and through his attorneys, Mari Newman, Andy McNulty, and Madeline Leibin of NEWMAN | MCNULTY, LLC, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1. James "Jimmy" Garcia suffered a tragedy when his girlfriend, Jacqueline Jones, died by suicide in their home on March 26, 2014. That tragedy turned into a nearly decade-long quest by the Monte Vista Police Department ("MVPD") to pin Ms. Jones' death on Mr. Garcia at the urging of Ms. Jones' powerful family, notwithstanding the objective, physical evidence of his innocence. Despite the fact that Ms. Jones' autopsy definitively ruled that she died by suicide, MVPD Chief John Rosecrans and Corporal Michael Martinez, along with district attorneys, decided years after Ms. Jones' death to fabricate evidence framing Mr. Garcia as her killer, hire two thoroughly discredited experts (referred to by El Paso County's medical examiner as "whack

1

jobs") to conduct an autopsy that pointed the blame at Mr. Garcia, and conspire with the high-school-educated coroner for Monte Vista to change Ms. Jones' listed cause of death from "suicide" to "undetermined." Then, all of these actors came together to maliciously prosecute Mr. Garcia. Mr. Garcia endured this prosecution for three years until, finally, a jury found him not guilty on all counts on September 29, 2023.

2.      Defendants' actions irrevocably harmed Mr. Garcia. He has been branded a murderer in his small community. He has been villainized by local officials. The damages he suffered because of Defendants' conduct are immense. He brings this lawsuit to hold these public officials accountable.

## PARTIES

3.      At all times relevant to this Complaint, Plaintiff James Garcia was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

4.      At all times relevant to this Complaint, Defendant Monte Vista was a Colorado municipal corporation.

5.      At all times relevant to this Complaint, Defendant John Rosecrans was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Rosecrans was acting within the scope of his official duties and employment and under color of state law in his capacity as the Chief of Police for Monte Vista. Defendant Rosecrans is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

6.      At all times relevant to this Complaint, Defendant Michael Martinez was a citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant times, Defendant Martinez was acting within the scope of his official duties and employment and under

color of state law in his capacity as a law enforcement officer for Monte Vista. Defendant

Martinez is a peace officer employed by a local government and, therefore, is subject to suit

under C.R.S. § 13-21-131

7.     At all times relevant to this Complaint, Defendant Robert Willett was a citizen of

the United States and resident of and domiciled in the State of Colorado. At all relevant times,

Defendant Willett was acting within the scope of his official duties and employment and under

color of state law in his capacity as District Attorney. Defendant Willett's relevant acts and

omissions were those of investigation and/or administration, not subject to absolute immunity.

8.     At all times relevant to this Complaint, Defendant Stephen Hunzeker was a

citizen of the United States and resident of and domiciled in the State of Colorado. At all relevant

times, Defendant Hunzeker was acting within the scope of his official duties and employment

and under color of state law in his capacity as the coroner for Monte Vista.

## JURISDICTION AND VENUE

9.     This action arises under the Constitution and laws of the United States, and is

brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28

U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred

by 42 U.S.C. § 1988.

10.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the

events giving rise to the claims occurred in this District and all Defendants reside in this District.

11.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the

violations of federal law alleged are substantial and the pendent causes of action derive from a

common nucleus of operative facts.

## FACTUAL ALLEGATIONS

### Jimmy Garcia Came Home to Find His Girlfriend, Jacqueline Jones, dead by suicide.

12.     Mr. Garcia met Jacqueline Jones at the Saint Ive's Bar in Alamosa, Colorado in approximately 2012. Mr. Garcia dated Ms. Jones for two years from 2012 until 2014.  Mr. Garcia loved Ms. Jones and considered her to be his wife.

13.     In the morning of March 26, 2014, Mr. Garcia woke up early because he was supposed to catch a ride with his friend, Arthur Garza, to Wyoming to work on a job in the oil fields. Mr. Garcia called another friend, Mr. Marquez around 5:00 a.m. asking him for a ride to Mr. Garza's house. During that call, Mr. Garcia expressed concern that he had missed his ride from Mr. Garza.

14.     At approximately 6:00 a.m., Mr. Garcia left his house and walked over to Mr. Garza's house to ask him when they would be leaving. Mr. Garza told Mr. Garcia that they would leave later, around 8:00 a.m. Mr. Garcia and Mr. Garza spoke for a little while. When Mr. Garza realized that Mr. Garcia was on foot, he gave Mr. Garcia his car to drive home.

15.     When Mr. Garcia arrived home, he found that the front door was locked. Mr. Garcia assumed that Ms. Jones had probably left to go grab something from the convenience store up the street and had locked the door behind her. Mr. Garcia went to the kitchen window, opened it, and climbed into the house. He sat down on the couch. After five or ten minutes, Mr. Garcia walked into the bedroom. What he saw in the bedroom haunts him to this day: Ms. Jones had hung herself with an extension cord. Mr. Garcia immediately ran over and pulled the noose off her neck. He checked her breath and, when he realized she wasn't breathing, Mr. Garcia began performing CPR. He also immediately called 911.

16.     Two MVPD officers, Officer Robby Martinez and Corporal Russell, were the first to respond. When Officer Martinez arrived at the house, he found Ms. Jones on the floor lying next to an extension cord that was hooked around the top of the wood closet door. Mr. Garcia was crying and saying, "why did she do this?" He told the officers immediately that Ms. Jones had hung herself and was in a state of panic over it. Mr. Garcia also told the officers that this "all happened because of Russell," referring to events of the previous day.

17.     On March 25, 2014, Ms. Jones had been on her way to meet with her probation officer when MVPD Officer Jason Russell pulled her over. She was given two traffic tickets and her car was impounded. Because of the traffic stop, Ms. Jones missed her meeting with her probation officer and a warrant was issued for her arrest. Ms. Jones was extremely upset during and after the traffic stop.

18.     Later in the day of March 25, 2014, Ms. Jones asked Mr. Garcia for a pen so she could write a letter. Only later did Mr. Garcia find out that it was a suicide note.

19.     On the evening of March 25, 2014, Mr. Garcia, Ms. Jones, Mr. Garcia's mother (Judy Lucero), and Ms. Lucero's son (Orlando Garcia) were hanging out and having dinner at Mr. Garcia's house. Ms. Lucero spoke with Ms. Jones extensively on the evening of March 25, 2014. During that conversation, Ms. Jones told Ms. Lucero that she was very concerned about being arrested for missing her probation meeting and about her vehicle being towed. She began crying. Ms. Lucero's other son, Mike Garcia, who had come over to Mr. Garcia's house to try to fix his heater on the evening of March 25, 2014, later confirmed that Ms. Jones was crying that evening over the ticket she had received, and her vehicle being impounded.

20.     Nonetheless, Mr. Lucero said that Mr. Garcia and Ms. Jones seemed happy when Ms. Lucero left the house that evening. Mr. Garcia and Ms. Jones were not fighting on the night

of March 25, 2014 and there were no signs of strife between them. Later in the evening, Mr. Garcia's brother, Justin Prieto, and his friend, Jeremiah Marquez, came to hang out at his house. Mr. Marquez described Mr. Garcia and Ms. Jones as "getting along" and stated there was no indication of any sort of fighting between them throughout the night. Mr. Garcia, Ms. Jones, Mr. Marquez, and Mr. Prieto were together at Mr. Garcia's house until approximately 3:30 a.m.

**Monte Vista targeted Mr. Garcia, and used all of its resources to pin Ms. Jones' death on him, despite the obvious evidence that her death was by suicide.**

21.     From the outset, the MVPD treated Mr. Garcia as a suspect. They searched his home, collected biological samples from him, and brought in a dog to sniff his home and vehicle. Mr. Garcia voluntarily provided the authorization for these invasive searches because he had nothing to hide.

22.     Mr. Garcia was fully cooperative with the police investigation and voluntarily spoke with them multiple times. Further, Mr. Garcia also voluntarily agreed to provide MVPD officers with a video-recorded walk through of his residence where he described his actions on the morning of March 26, 2014.

23.     After Ms. Jones' suicide, Mr. Garcia moved out of his house and into his mother's house because he could no longer bear to live where Ms. Jones had killed herself.

24.     At approximately 9:00 p.m. on March 26, 2014, Ms. Lucero was at Mr. Garcia's house to pick up blankets. While Ms. Lucero was pulling some blankets off Mr. Garcia's bed, she noticed a letter. Ms. Lucero called Mr. Garcia into the bedroom and told him that she found a suicide note under the blankets. Mr. Garcia picked up the note and then called the police.

25.     MVPD Officer Rodriguez responded to Mr. Garcia's house and Mr. Garcia gave Officer Rodriguez the note. When recounting Ms. Jones' suicide to officer Rodriguez, Mr. Garcia broke down into tears. The suicide note was placed into evidence.

26.     On March 28, 2014, MVPD Officer Rodriguez and Officer Matthew Bordewick attempted to recreate Ms. Jones' hanging. The officers very crudely took 150 pounds in free weights (what they estimated to be the approximate weight of Ms. Jones) and hung them with an electrical cord on one of the doors in the Monte Vista Police Department headquarters. They left the weights hanging for 30 minutes and examined the door. This crude and completely unscientific recreation would later be used by Defendants to maliciously prosecute Mr. Garcia despite the fact that it was wholly unscientific and provided no basis whatsoever to believe that Mr. Garcia had murdered Ms. Jones.

27.     Monte Vista Police Department Officer Dylan Sutton interviewed Nikki Kline, a friend of Ms. Jones, on April 14, 2014. During that interview, Officer Sutton asked Ms. Kline if she believed that Mr. Garcia would have killed Ms. Jones. Ms. Kline told Officer Sutton that she did not believe that Mr. Garcia would have killed Ms. Jones because he seemed genuinely upset at her death.  Ms. Kline told Officer Sutton that, the night before Ms. Jones committed suicide, she called their mutual friend, Dominic Gaitan, telling him goodbye and asking him to take care of her child.

### MVPD's Investigation Revealed that Jacqueline Jones had a long history of depression, suicidal ideation, and trauma.

28.     MVPD's investigation quickly revealed that Ms. Jones' suicide was the culmination of a long history of depression, suicidal ideation and trauma.

29.     During the time that they dated, Ms. Jones often had suicidal thoughts, and Mr. Garcia came to learn about her troubled youth. Ms. Jones was molested as a child. After the death of her father during her teenage years, Ms. Jones engaged in self-harming behavior and began experimenting with various drugs. Because of this, and her depression, Ms. Jones' mother,

Jennifer Kelleher, sent her to a school for troubled youth (the Stillwater Academy in Jordan, Utah). Ms. Jones never forgave her mother for this and felt as though her mother gave up on her.

30.     Ms. Jones was sexually assaulted in July of 2012, which caused her to suffer increased symptoms of depression. Ms. Jones was diagnosed with recurring form Major Depressive Disorder on September 21, 2012. Accordingly, she was prescribed anti-depressant medication. Ms. Jones told doctors that she was suffering from severe depression at the time and was sleeping far too much because of it. Ms. Jones told medical providers that she had a previous severe depressive episode four years prior, in 2008, after the birth of her son. Ms. Jones also told her medical providers that her mother also suffers from depression and that it runs on her family. At one point, Ms. Jones was also diagnosed with borderline personality disorder.

31.     In April of 2013, Ms. Jones again sought help for symptoms of depression. She reported that her drug use made her feel hopeless, but she could not help going back to using drugs.

32.     On August 3, 2013, Ms. Jones attempted suicide. According to medical records, Ms. Jones was home alone without Mr. Garcia and felt lonely without him. When he returned home, Ms. Jones felt as though Mr. Garcia was avoiding her. Because of this, Ms. Jones took an entire bottle of amitriptyline. Prior to taking the bottle of pills, Ms. Jones was using cocaine and benzodiazepines. During that suicide attempt, Ms. Jones almost died and was placed on a ventilator. Ms. Jones told her provider during her hospitalization for her suicide attempt that she had previously engaged in suicidal gestures and self-harm.

33.     When she was incarcerated later in 2013 for drug use, Ms. Jones was placed in an intensive outpatient treatment program because of serious mental health concerns and cocaine addiction. Ms. Jones attended therapy for her depression throughout 2013 while she was

incarcerated. Ms. Jones wrote in her diary about having suicidal ideations and depression extensively throughout August 2013 through February of 2014.

34.    In the winter of 2013, Ms. Jones struggled with addiction to cocaine. Because of this, she was in and out of jail and rehab. When she left rehab, Ms. Jones stopped taking her bipolar medication. Ms. Jones also began heavily consuming alcohol upon release from rehab and she often drank an entire bottle of Southern Comfort nightly.

35.    In December of 2013, Ms. Jones sought treatment for her depression while she was incarcerated. Ms. Jones reported feeling depressed and anxious. At that time, Ms. Jones was again diagnosed with severe and recurrent Major Depressive Disorder. During the visit with her healthcare provider, Ms. Jones asked that she be placed back onto medication to cope with her symptoms of depression. On December 31, 2013, during a session with her therapist while she was incarcerated, Ms. Jones admitted that when she used drugs her suicidal thinking "increased a lot" and that she would think about "just ending it because she was already messed up so what was the point." Ms. Jones admitted that she would lie to other people about her suicidal thoughts and her drug use. On February 18, 2014, Ms. Jones was supposed to have a therapy session with her mother while she was incarcerated, but her mother never showed up. Ms. Jones told her therapist that she wanted to "give up" since her mom had "given up on her."

36.    Ms. Jones had written a number of letters in the past about suicide and Mr. Garcia had caught Ms. Jones previously with a gun up to her own head.

**The objective scientific evidence determined that Ms. Jones died by suicide and could not have been murdered by Mr. Garcia.**

37.    On July 9, 2014, the El Paso County Coroner, Daniel Lingamfelter, as authorized by the Rio Grande County Coroner, issued his report regarding Ms. Jones' death. The autopsy report unequivocally found that Mr. Jones died by suicide as a result of hanging. It specifically

noted that investigative and autopsy findings were consistent with her death being deliberate and self-inflicted. There was nothing in the report that indicated, in any way, that Mr. Garcia caused, or was involved in, Ms. Jones' death.

38.     Dr. Lingamfelter later told a district attorney that he conducted his autopsy with the mindset that Ms. Jones' death was going to be considered by the MVPD to be strangulation by Mr. Garcia until proven otherwise. Based on that suspicion and preconception by the MVPD that Ms. Jones was strangled and died by homicide, Dr. Lingamfelter ensured he did an extremely thorough autopsy. But despite his preconception, the medical evidence led Dr. Lingamfelter to conclusively determine that there was no evidence to support a determination that Ms. Jones was strangled or died by homicide. The manner of death was clearly suicide.

39.     Despite this definitive determination by a neutral coroner, MVPD Sergeant William Mistretta told Ms. Jones' family members that the MVPD would continue to try to pin Ms. Jones' death on Mr. Garcia. Dr. Lingamfelter would later remark that, after completing the autopsy report, the situation snowballed into a "weird soap opera."

40.     This "weird soap opera" — a coordinated pressure campaign by Defendants — started immediately after Dr. Lingamfelter finalized his report. MVPD leadership called Dr. Lingamfelter into several meetings to try to pressure him into changing his medical findings regarding the cause of Ms. Jones' death. In one of the meetings, a MVPD law enforcement official said to Dr. Lingamfelter that "I don't like this guy" referring to Mr. Garcia. It was immediately clear that the MVPD leaders had a vendetta against Mr. Garcia and were doing everything in their power to charge him with homicide despite the lack of evidence that Ms. Jones died by homicide or that Mr. Garcia was in any way involved in her death. The

information presented at these meetings did not even rise to the level of being a circumstantial homicide case.

41.     On September 23, 2014, Ms. Jones' mother, Jennifer Kelleher, called MVPD Officer Sutton and told him that she had hired a private investigator and intended to help the MVPD work the investigation from a different angle in order to support a conclusion that Ms. Jones' death was not a suicide. Instead of discouraging this notion given the definitive, final autopsy report to the contrary, MVPD Officer Sutton told Ms. Kelleher that he would look into her proposal and Ms. Jones' tragic death further.

### Monte Vista conspired with two discredited "experts", a coroner, and the District Attorney's office to prosecute Mr. Garcia, despite definitive scientific evidence demonstrating that Ms. Jones died by suicide with no involvement by Mr. Garcia.

42.     For the next three years, Mr. Garcia grieved the loss of Ms. Jones. In that time, no new evidence emerged about Ms. Jones' death and, certainly, no evidence emerged to call into question the coroner's conclusion that she had died by suicide with no involvement from Mr. Garcia.

43.     In 2017, Defendant John Rosecrans was appointed MVPD Chief, and decided to prosecute Mr. Garcia for Ms. Jones' death – notwithstanding the definitive evidence that she had died from a deliberate self-inflicted suicide by hanging. Shortly after his appointment, Defendant Rosecrans held a community forum. Ms. Kelleher was in attendance and asked Defendant Rosecrans about the investigation into her daughter's death. After speaking with Ms. Kelleher, Defendant Rosecrans promoted MVPD Officer Michael Martinez to Corporal and assigned him to renew the investigation into the death of Ms. Jones. Under orders of Defendant Rosecrans, starting in 2018, Defendant Martinez began a new investigation into Ms. Jones' death.

44.    Immediately, Ms. Jones' family steered the investigation conducted by Defendant Rosecrans and Defendant Martinez toward their desired result: the arrest and prosecution of Mr. Garcia for the death of Ms. Jones. In contravention of accepted practices, Defendant Rosecrans allowed Ms. Kelleher to attend witness interviews. Stunningly, Defendant Rosecrans even paid for Ms. Kelleher to fly to Arizona with Defendant Martinez to interview a key witness.

45.    Ms. Kelleher found two thoroughly discredited experts, Richard Eikelenboom and Selma Eikelenboom-Schieveld, through the television show 'Cold Justice' (which initially agreed to pay the experts in exchange for allowing the television show to film in Monte Vista) and introduced them to Defendant Martinez and Defendant Rosecrans.

46.    At the urging of Ms. Kelleher, Defendant Rosecrans and Defendant Martinez hired Eikelenboom and Defendant Eikelenboom-Schieveld and paid them thousands of dollars (on top of $3,000 that Ms. Kelleher paid) to provide a new autopsy with a finding that Ms. Jones' manner of death was homicide.

47.    Defendants Rosecrans and Martinez worked with Eikelenboom and Eikelenboom-Schieveld to hire a European doctor to purposefully produce an unscientific, non-credible autopsy. The autopsy was engineered from the beginning to find that Ms. Jones died by homicide, despite all objective evidence to the contrary.

48.    The District Attorney's Office, including Defendant Robert Willett, was involved in the initial meeting with Eikelenboom, Eikelenboom-Schieveld. and the European doctor they had hired. Defendant Willett engaged with these individuals in an investigative and/or administrative capacity, outside of his role in initiating a prosecution or presenting the State's case.

49.     Defendants MVPD, Rosencrans, Martinez and Willett were or should have been aware that Richard Elkelenbloom had been disqualified from serving as an expert in widely publicized 2016 trial after the Denver District Attorney pushed him to admit on the stand that he had no direct DNA extraction or analysis experience, that he operates a lab that has not been accredited, that he personally failed his basic proficiency tests in 2011 and 2012, and that he was 'self-trained' in running DNA profiles.

50.     Despite their knowledge that Elkenbloom had been discredited, Defendants MVPD, Rosencrans, Martinez and Willett chose to work with Elkenbloom and his team to create an alternate autopsy report reaching their desired – but false – conclusion in order to prosecute Mr. Garcia. In so doing, Defendants MVPD, Rosencrans, Martinez and Willett obtained false evidence by shopping around for experts until they found one who would provide the opinion they sought.

51.     In the meeting with Eikelenboom and Eikelenboom-Schieveld, Defendants Rosecrans, Martinez and Willett provided the discredited experts and their hired doctor with selected evidence – but made the affirmative decision not to provide them all of the relevant evidence – regarding Ms. Jones' death. The only other information that Eikelenboom, Eikelenboom-Schieveld, and their hired European doctor were provided and considered was what was verbally conveyed to them by Ms. Kelleher, a clearly biased reporter.

52.     Dr. Lingamfelter, the El Paso County Coroner who issued the original, definitive report determining Ms. Jones' death was by suicide, would later be asked by a Deputy District Attorney, Amy Beard, about the autopsy report authored by Eikelenboom and Eikelenboom-Schieveld. Dr. Lingamfelter told her that it was authored by "some whack jobs from Europe" who had been paid by the MVPD to write a report finding Ms. Jones' death a homicide.

53.     Dr. Leon Kelly, the El Paso County Coroner in 2018 would later tell an investigator hired by Mr. Garcia's defense lawyers and testify in Court that a number of the conclusions drawn by the Eikelenbooms in their autopsy were incoherent and that these incoherent conclusions disqualified their opinions. With respect to one of conclusions drawn by Eikelenboom and Eikelenboom-Schieveld, Dr. Kelly called it "the dumbest thing" he had ever heard.

54.     Indeed, Dr. Lingamfelter and Dr. Kelly had both resisted pressure by Defendant Martinez and Defendant Rosecrans to change Ms. Jones' autopsy to conclude that she died by homicide, instead insisting that the actual medical evidence should control their findings. Defendant Martinez and Defendant Rosecrans set up a meeting with Dr. Lingamfelter and Dr. Kelly to speak about the autopsy because they had been told by one of the District Attorneys (who they had tried to convince to indict Mr. Garcia for murder) that the manner of death as suicide on the autopsy was a problem that impeded the indictment. During that meeting, Defendant Martinez and Defendant Rosecrans used a PowerPoint to try to convince Dr. Lingamfelter and Dr. Kelly to change the findings in the autopsy. Dr. Kelly pointedly asked Defendant Martinez and Defendant Rosecrans what new information had been discovered, that was not just feelings about the case, that would shed new light on the cause of death. Their response to Dr. Kelly was, essentially, that there was no new information, just more persistence from Ms. Jones' family that they should prosecute Mr. Garcia. Dr. Kelly told Defendant Martinez and Defendant Rosecrans that his review of all of the evidence supported Dr. Lingamfelter's determination that everything was consistent with a finding of suicide. Dr. Kelly told Defendant Martinez and Defendant Rosecrans that there was nothing in the death of Ms. Jones that would distinguish it from the hundreds of suicidal hangings he had seen throughout

his career. Defendant Martinez and Defendant Rosecrans, during their conversations with Dr. Kelly and Dr. Lingamfelter, repeatedly told them that Mr. Garcia was "not a good dude" and that they were suspicious of him, but never provided any evidence that supported changing the manner of death from suicide to anything else. Dr. Lingamfelter told Defendant Martinez and Defendant Rosecrans that he was not going to change the manner of death. Defendant Martinez continued to pressure Dr. Lingamfelter, but Dr. Lingamfelter refused to capitulate to Defendant Martinez's demands, telling Defendant Martinez and Defendant Rosecrans that the pressure campaign mounted by Ms. Jones' family did not affect the medical and scientific aspect of the case, which unequivocally demonstrated that Ms. Jones' death was a suicide.

55.    Defendant Rosecrans and Defendant Martinez continued their campaign to ensure that Mr. Garcia was maliciously prosecuted when Defendant Stephen Hunzeker was appointed as the new Rio Grande County Coroner in March of 2017 and elected to the same role in 2018. Defendant Hunzeker, notably, is not a doctor. In fact, he did not graduate from college.

56.    From the first moment Defendant Hunzeker took office, Defendant Rosecrans and Defendant Martinez persistently demanded that he change the manner of death listed on Ms. Jones' death certificate from suicide to homicide. Ms. Jones' family also approached him multiple times demanding the same change. At one point, Defendant Hunzeker's wife coached a swim team that Ms. Jones' son was on, and Ms. Jones' father approached Defendant Hunzeker at a swim meet and pressured him to change the manner of death on Ms. Jones' death certificate.

57.    Furthermore, Defendant Hunzeker had obvious conflicts of interest. In an interview with an investigator hired by Mr. Garcia's defense counsel, on April 22, 2021, Defendant Hunzeker, who runs a funeral home, admitted that he had been paid by Ms. Jones' family for Ms. Jones' funeral services. And Ms. Jones' stepfather, Scott Kelleher, sold Defendant

Hunzeker his car. During that sale, he lobbied Defendant Hunzeker to change the manner of death on Ms. Jones' death certificate. Defendant Hunzeker knew well that Ms. Jones' death was headline news in the San Luis Valley.

58.    Less than a year after he was elected coroner, on October 25, 2019, Defendants Martinez, Rosecrans, and Willett met with Defendant Hunzeker in order to convince him to change the manner of death on Ms. Jones' death certificate from suicide to homicide. Around the same time that Defendant Hunzeker met with the MVPD, then 12th Judicial District Attorney Christa Newmeyer-Olsen spoke with Defendant Hunzeker and told him that he was within his rights to change the manner of death on Ms. Jones' death certificate.

59.    When Defendant Hunzeker met with Defendant Martinez, Defendant Rosecrans, and Defendant Willett, he knew that there was pressure from Ms. Jones' family to change her manner of death from suicide to homicide.

60.    When Defendant Martinez and Defendant Rosecrans first asked Defendant Hunzeker to change the manner of death to homicide and he said, "absolutely not." Notably, he responded to Defendant Martinez's and Defendant Rosecrans' demands by saying that he would not "stick his neck out" by making that change because he was "not comfortable that there was enough evidence to change it to homicide."

61.    But despite having no new evidence, on November 21, 2019, over five years after Ms. Jones died and under intense pressure from Defendant Martinez and Defendant Rosecrans, Defendant Hunzeker filed an amendment with the State of Colorado to change Ms. Jones' manner of death on her death certificate from "suicide" to "could not be determined." Defendant Hunzeker knew that changing the manner of death from suicide to "undetermined" would cause Mr. Garcia to be prosecuted for Ms. Jones' death. Knowing that his actions would cause Mr.

Garcia's prosecution, that there had not been enough evidence to change Ms. Jones' cause of death to homicide, and that there was no new evidence that would support changing Ms. Jones' manner of death to "could not be determined", Defendant Hunzeker still made the change to the death certificate.

62.     When Dr. Kelly was later informed that Defendant Hunzeker had changed Ms. Jones' cause of death on the death certificate to undetermined, Dr. Kelly responded that he believed that Defendant Hunzeker had been pressured by MVPD officers (including Defendant Rosecrans and Defendant Martinez) and the family of Ms. Jones to make that change. Dr. Lingamfelter also stated that Defendant Hunzeker, who is not a medical doctor or examiner, was pressured to change the cause of death determination until he "caved" in changing the cause of death from suicide to undetermined.

63.     Defendant Rosecrans and Defendant Martinez, conspiring with Defendant Willett, and Defendant Hunzeker initiated the malicious prosecution of Mr. Garcia for the first-degree murder of Ms. Jones. Each of these Defendants initiated the prosecution knowing that they did not have probable cause to believe Mr. Garcia had murdered Ms. Jones. The reason they initiated the prosecution of Mr. Garcia was to appease the rich, powerful, and influential family of Ms. Jones who wished to see Mr. Garcia prosecuted for her suicide.

64.      Defendant Martinez drafted the arrest affidavit that directly caused Mr. Garcia's malicious prosecution, and Defendant Willett submitted it to the court on December 2, 2020.

65.     Knowing that there was no probable cause to believe that Mr. Garcia had committed any of these crimes, and Defendant Martinez and Defendant Willett authored and submitted an arrest affidavit bringing charges against Mr. Garcia for Murder in the First Degree

in violation of C.R.S. § 18-3-102(1)(a)(3), Domestic Violence in violation of C.R.S. § 18-6-800.3, and Tampering with Physical Evidence in violation of C.R.S. § 18-8-610(1)(a)(b)(3).

66.    In the arrest affidavit, Defendant Martinez made no mention of the fact that Ms. Jones' autopsy definitively concluded that she committed suicide, or that the doctors who conducted the autopsy were adamant that it was medically impossible that Mr. Garcia had murdered Ms. Jones. The arrest affidavit does not include that the coroner originally determined Ms. Jones' death was by suicide and that the death certificate was only changed to "undetermined" by a high school graduate after years of pressure from MVPD officers and Ms. Jones' family. Moreover, the arrest affidavit completely, egregiously omits Ms. Jones' long history of depression and suicidality. It fails to mention the traffic stop of Ms. Jones that led her to spiral into deepening depression, and the fact that she was worried she would be sent back to prison for missing her probation meeting on the day of her death. Similarly, it fails to mention that Ms. Jones lost her new apartment due to her newly re-engaged drug use immediately prior to her death, or that Ms. Jones was found dead with cocaine in her system and that her past drug use had historically led to suicidality. All of these pieces of information contradict the knowingly false narrative advanced by these Defendants in the arrest affidavit and are material omissions that show that there was no probable cause to believe that Mr. Garcia murdered Ms. Jones.

67.    Based on Defendant Rosecrans', Defendant Martinez', and Defendant Willett's submission of an affidavit purposefully omitting exonerating information, Mr. Garcia was arrested. He spent weeks in jail before he could post bond. Then, he was prosecuted for years.

68.    In the intervening years, the District Attorney's office conducted multiple interviews with key witnesses that made it clear to them that there was no probable cause to believe Mr. Garcia murdered Ms. Jones.

69.     On September 27, 2022, Deputy District Attorneys Amy Beard and Jacob Mathews interviewed Dr. Lingamfelter. During that interview, Dr. Lingamfelter told Beard and Mathews that there was no medical evidence to support the allegation that Mr. Garcia had murdered Ms. Jones.

70.     On September 29, 2022, Beard interviewed Dr. Leon Kelly. During that interview, Dr. Kelly told Beard that there was no medical evidence to support the allegation that Mr. Garcia murdered Ms. Jones.

71.     Despite these interviews that eviscerated any hint of probable cause that could have arguably existed before them, Defendant Willett did not drop the charges against Mr. Garcia.

72.     Mr. Garcia endured the specter of prosecution for years. He paid his criminal defense lawyers a significant amount of money for his defense. And his emotional distress was significant, too. During the drawn-out, malicious prosecution, Mr. Garcia was branded a murderer in his small community and was villainized by local officials. The damages caused by Defendants' actions are immense.

73.     Eventually, on September 29, 2023, a jury found Mr. Garcia not guilty of all counts. It was obvious to the jury that the prosecution of Mr. Garcia was based on little more than prejudice against him.

**Pursuant to its custom and practice, Defendant Monte Vista abjectly failed to discipline the Individual Defendants for their unconstitutional conduct.**

74.     Upon information and belief, Defendant Monte Vista has imposed no discipline on the MVPD Individual Defendants for their unconstitutional actions against Mr. Garcia. Upon information and belief, Defendant Monte Vista has not even conducted an investigation into its

officers' clearly unconstitutional actions. Defendant Monte Vista, through its inaction, has condoned the conduct of the MVPD Individual Defendants.

75.    Based on Defendant Monte Vista's custom and practice of tolerating and ratifying such unconstitutional conduct, the MVPD Individual Defendants knew prior to violating Mr. Garcia's constitutional rights that they would not be disciplined by Defendant Monte Vista for their actions.

## The actions of the MVPD officers in prosecuting Mr. Garcia were ordered and condoned by Monte Vista's final policymaker.

76.    Defendant Rosecrans is the final policymaker for all actions by the MVPD. He is given this authority by the laws, customs, policies, and practices of Monte Vista. Under the ordinances of Monte Vista, the police chief is "charged with the duty of crime prevention, crime detection, criminal apprehension, police records, traffic control and the efficient conduct of the Police Department generally" along with having the duty to "see that the applicable ordinances of the City and the laws of the State are duly enforced and the rules and regulations of the Police Department obeyed." MONTE VISTA MUN. CODE § 2-6-30.

77.    Defendant Rosecrans authorized, condoned, and continued the malicious prosecution of Mr. Garcia without probable cause. Defendant Rosecrans made the decision to initiate the malicious prosecution of Mr. Garcia and to prosecute him without probable cause simply because Ms. Jones' rich, powerful, and influential family wanted Mr. Garcia to be prosecuted for Ms. Jones' murder.

78.    Defendants Martinez authored the arrest affidavit with the explicit approval of Defendant Rosecrans.

20

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth and Fourteenth Amendment Violation — Malicious Prosecution
*Against All Defendants*

79.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

80.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

81.     Defendants are "persons" under 42 U.S.C. § 1983.

82.     Defendants initiated charges and took another actions against Plaintiff knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime. Each Defendant was instrumental in Plaintiff's prosecution.

83.     No probable cause supported Plaintiff's original arrest or prosecution.

84.     Defendants knew that there was no probable cause to support Plaintiff's original arrest or prosecution. Defendants' motivation in prosecuting Mr. Garcia was not to bring to justice a person thought to have committed a crime, but rather for the purpose of punishing Plaintiff.

85.     Defendants acted with malice in initiating the charges and taking other actions against Plaintiff, thereby causing his continued prosecution.

86.     Defendants engaged in the above actions and omissions intentionally, knowingly, maliciously, willfully, wantonly, and in reckless disregard of Plaintiff's federally protected rights.

87.    Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

88.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

89.    The charges against Plaintiff resulting from the actions and omissions of Defendants described herein were dismissed; thus, the original action against Plaintiff terminated in his favor.

90.    The Individual Defendants' actions and inactions were in accordance with Defendant Monte Vista's customs, policies, or practices.

91.    Final policymakers and/or those who had been delegated final policymaking authority for Defendant Monte Vista authorized the actions that violated Plaintiff's constitutional rights.

92.    Defendant Monte Vista's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights.

93.    Defendant Monte Vista's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights

94.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

95.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests

without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

96.     Plaintiff continues to be damaged by Defendants' violations of his rights.

### SECOND CLAIM FOR RELIEF[1]
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7 & Colo. Const. Art. II, Section 25
### Malicious Prosecution
*Against Defendants Rosecrans and Martinez*

97.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

98.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as a law enforcement officers at all times relevant to the allegations in this Complaint.

99.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

100.    Plaintiff had a protected interest under the Colorado Constitution against being subjected to malicious prosecution.

101.    Defendants initiated charges and took another actions against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime. Defendants were instrumental in Plaintiff's prosecution.

102.    No probable cause supported Plaintiff's original citation and prosecution.

---

[1] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

103.    Defendants knew that there was no probable cause to support Plaintiff's original arrest or prosecution. Defendants' motivation was not to bring to justice a person thought to have committed a crime, but for the purpose of punishing Plaintiff.

104.    Defendants acted with malice in initiating the charges and taking other actions against Plaintiff, thereby causing his continued prosecution.

105.    The charges against Plaintiff resulting from the actions and omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

106.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to Plaintiff's protected rights.

107.    Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

108.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

109.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

110.    Plaintiff continues to be damaged by Defendants' violations of his rights.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Unlawful Arrest
*Against Defendants Rosecrans and Martinez*

111.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

112.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

113.    Defendants are "persons" under 42 U.S.C. § 1983.

114.    Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violation of the law prior to causing his arrest.

115.    No legally recognizable exigent circumstances existed which would have justified or permitted Defendants' conduct.

116.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

117.    The Individual Defendants' actions and inactions were in accordance with Defendant Monte Vista's customs, policies, or practices.

118.    Final policymakers and/or those who had been delegated final policymaking authority for Defendant Monte Vista authorized the actions that violated Plaintiff's constitutional rights.

119.    Defendant Monte Vista's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights.

120.    Defendant Monte Vista's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights

121.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this unlawful arrest claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

122.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

123.    Plaintiff continues to be damaged by Defendants' violations of his rights.

**FOURTH CLAIM FOR RELIEF[2]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 7**
**Unlawful Arrest**
*Against Defendants Rosecrans and Martinez*

124.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

---

[2] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

125.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

126.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

127.    Plaintiff had a protected interest under the Colorado Constitution against being unlawfully arrested.

128.    Defendants did not have probable cause or any other legal basis to believe that Plaintiff had committed or was committing any violation of the law prior to causing his arrest.

129.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

130.    Defendants' intentional, willful, and wanton seizure of Plaintiff, as described herein, was solely based on Plaintiff's exercise of his free speech rights.

131.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

132.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings,

emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

133.    Plaintiff continues to be damaged by Defendants' violations of his rights.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Due Process**
*Against All Defendants*

134.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

135.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

136.    Defendants are "persons" under 42 U.S.C. § 1983.

137.    Defendants, in the manner described more fully above, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

138.    Defendants continued their investigation of Plaintiff despite the fact that they knew, or were deliberately indifferent to, his innocence, and the results of the investigation were used to cause Plaintiff's prosecution and conviction. Moreover, Defendants used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent to, the fact that those techniques would yield false information that was used to attempt to convict Plaintiff.

139.    Defendants' misconduct directly resulted in the unjust criminal prosecution of Plaintiff, thereby denying him his constitutional right to due process and a fair trial guaranteed

by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

140.    Defendants subjected Plaintiff to arbitrary governmental conduct that shocks the conscience in that they deliberately and intentionally attempted to frame Plaintiff for a crime of which he was totally innocent. Defendants' actions violated fundamental canons of decency and fairness and violated Plaintiff's rights under the Fourteenth Amendment.

141.    The misconduct of Defendants was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

142.    Defendants who did not personally initiate the prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

143.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

144.    The Individual Defendants' actions and inactions were in accordance with Defendant Monte Vista's customs, policies, or practices.

145.    Final policymakers and/or those who had been delegated final policymaking authority for Defendant Monte Vista authorized the actions that violated Plaintiff's constitutional rights.

146.    Defendant Monte Vista's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights.

147.    Defendant Monte Vista's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights

148.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein,

including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

149.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

150.    Plaintiff continues to be damaged by Defendants' violations of his rights.

**SIXTH CLAIM FOR RELIEF[3]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 25**
**Due Process Violation**
*Against Defendants Rosecrans and Martinez*

151.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

152.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

153.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

---

[3] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

154.    Plaintiff had a protected interest under the Colorado Constitution in his right to due process.

155.    Defendants, in the manner described more fully above, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

156.    Defendants continued their investigation of Plaintiff despite the fact that they knew, or were deliberately indifferent to, his innocence, and the results of the investigation were used to cause Plaintiff's prosecution and conviction. Moreover, Defendants used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent to, the fact that those techniques would yield false information that was used to attempt to convict Plaintiff.

157.    Defendants' misconduct directly resulted in the unjust criminal prosecution of Plaintiff, thereby denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

158.    Defendants subjected Plaintiff to arbitrary governmental conduct that shocks the conscience in that they deliberately and intentionally attempted to frame Plaintiff for a crime of which he was totally innocent. Defendants' actions violated fundamental canons of decency and fairness and violated Plaintiff's rights under the Fourteenth Amendment and the Colorado Constitution.

159.    The misconduct of Defendants was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others.

160.     Defendants who did not personally initiate the prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

161.     Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

162.     Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

163.     Plaintiff continues to be damaged by Defendants' violations of his rights.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Due Process
*Against All Defendants*

164.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

165.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

166.     Defendants reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby deprive him of his constitutional rights. Defendants agreed to

investigate and exert influence to cause the prosecution of Plaintiff for a crime he did not commit and took overt actions in conformity with that agreement.

167.    Defendants conspired to accomplish an unlawful purpose by unlawful means and agreed among themselves to protect one another from liability by depriving Plaintiff of his Constitutional rights.

168.    In furtherance of their conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

169.    The conspiratorial misconduct was objectively unreasonable and undertaken intentionally with reckless and deliberate indifference to the rights of others.

170.    Defendants' actions and inactions caused, directly and proximately, Plaintiff damages. As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer economic damages such as financial losses.

171.    Additionally, as a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has suffered and continues to suffer emotional distress, humiliation, lost earnings, emotional distress, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses.

172.    Plaintiff continues to be damaged by Defendants' violations of his rights.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

a.  All appropriate relief at law and equity;

b.  Declaratory relief;

c.  Injunctive relief;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, such as humiliation, loss of enjoyment of life, deep sadness, anger, outrage, discomfort, fear, anxiety, humiliation, embarrassment, and other significant injuries, damages, and losses;

f.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    1.  Issuance of a formal written apology from each Defendant to Plaintiff;

    2.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    3.  Mandatory training designed to avoid future similar misconduct by Defendants;

h.  Pre-judgment and post-judgment interest at the highest lawful rate;

i.  Attorney's fees and costs; and

j.   Such further relief as justice requires.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 10th day of March 2025.

NEWMAN | MCNULTY, LLC

*/s/ Mari Newman*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street Suite 304
Denver, CO 80218
(720) 850 - 5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

COUNSEL FOR PLAINTIFF