**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-0769-WJM-KAS

JIMMY LEE GARCIA,

     Plaintiff,

v.

CITY OF MONTE VISTA, COLORADO,
JOHN ROSECRANS, in his individual capacity,
MICHAEL MARTINEZ, in his individual capacity,
ROBERT WILLET, in his individual capacity,
STEPHEN HUNZEKER, in his individual capacity,
SELMA EIKELENBOOM-SCHIEVELD, in her individual capacity,
and RICHARD EIKELENBOOM, in his individual capacity,

     Defendants.

---

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

---

Before the Court are four motions:

1)     Defendants City of Monte Vista (the "City"), John Rosecrans, and Michael Martinez's (collectively, the "Monte Vista Defendants") Partial Motion to Dismiss Amended Complaint [ECF 33] Under F.R.C.P. 12(B)(6), (ECF No. 45);

2)     Defendant Robert Willet's Motion to Dismiss Amended Complaint, (ECF No. 51);

3)     Defendant Stephen Hunzeker's Motion to Dismiss Plaintiff's Amended Complaint and Jury Demand [ECF #33] Pursuant to Fed. R. Civ. P. 12(b)(6), (ECF No. 53); and

4)     Defendants Selma Eikelenboom-Schieveld and Richard Eikelenboom's Motion to Dismiss Complaint Under Fed. R. Civ. P. 12(b)(6), (ECF No. 80),

(each a "Motion," collectively the "Motions").  Plaintiff Jimmy Lee Garcia filed a response

to each Motion.  (ECF Nos. 56–58, 86.)  And all Defendants but Eikelenbloom-

Schieveld and Eikelenbloom filed a reply in support of their respective Motions.  (ECF
Nos. 67, 71, 73.)

As more fully set forth below, the Monte Vista Defendants' Motion is granted in
part and denied in part; Willet's Motion is granted; Hunzeker's Motion is denied; and
Eikelenbloom-Schieveld and Eikelenbloom's Motion is denied.

## I. BACKGROUND[1]

### A.    MVPD's Initial Investigation of Jones' Death

In the early morning hours of March 26, 2014, Plaintiff Jimmy Lee Garcia walked
into the bedroom of the home he shared with his girlfriend of two years, Jacqueline
Jones, to find that she had tragically committed suicide by hanging.  (ECF No. 70 at
¶¶ 14–17.)

The Monte Vista Police Department ("MVPD") treated Garcia as a suspect in its
investigation of Jones' death from the outset.  (*Id.* at ¶¶ 23–24.)  But, according to the
SAC, the investigation "quickly revealed that Ms. Jones' suicide was the culmination of
a long history of depression, suicidal ideation and trauma."  (*Id.* at ¶ 30; *see also id.* at
¶¶ 31–38.)  The objective scientific evidence further supported that Jones died by

---

[1] The Background is drawn from the Second Amended Complaint ("SAC").  (ECF No. 70.)  The Court assumes the allegations contained in the SAC to be true for the purpose of deciding the Motions.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

The Court additionally notes that, in its analysis below, it occasionally refers to and cites the First Amended Complaint ("FAC"), rather than the SAC.  (ECF No. 33.)  Though the FAC has been superseded by the SAC, the Court permitted the Monte Vista Defendants, Willet, and Hunzeker to stand on their motions to dismiss filed in response to the FAC based on Plaintiff's representation that the SAC "does not make changes to the allegations" against those Defendants.  (ECF No. 68 at 1; *see also* ECF Nos. 74, 75, 79.)  The Court declines to undertake the onerous task of converting all the parties' citations to the allegations in the FAC to the corresponding paragraph number in the SAC.  So, where the parties have cited the FAC in their briefing, the Court likewise cites the FAC in its corresponding discussion.

suicide and could not have been murdered by Garcia.  (*Id.* at ¶ 39.)  On July 9, 2014, the El Paso County Coroner, Daniel Lingamfelter, as authorized by the Rio Grande County Coroner, issued an autopsy report unequivocally finding that Jones died by suicide as a result of hanging.  (*Id.*)  Garcia alleges that Dr. Lingamfelter later told a district attorney that he conducted the autopsy with the mindset that the MVPD would consider Jones' death to have been caused by strangulation until proven otherwise, so he "ensured he did an extremely thorough autopsy."  (*Id.* at ¶ 40.)

Despite the foregoing, MVPD allegedly assured Jones' family members that they would try to pin her death on Garcia.  (*Id.* at ¶ 41.)  Consistent therewith, the SAC alleges that MVPD leadership called Dr. Lingamfelter into several meetings to pressure him into changing his medical findings regarding the cause of Jones' death.  (*Id.* at ¶ 42.)  In one such meeting, a MVPD law enforcement official allegedly said to Dr. Lingamfelter, "I don't like this guy," referring to Garcia.  (*Id.*)

The SAC also alleges that Jones' mother, Jennifer Kelleher, became heavily involved in the investigation.  For instance, Jennifer Kelleher allegedly called one MVPD officer on September 23, 2014 and informed him that she had hired a private investigator "to help the MVPD work the investigation from a different angle in order to support a conclusion that Ms. Jones' death was not a suicide."  (*Id.* at ¶ 43.)  Rather than discourage the notion, the officer told Kelleher that he would look into her proposal and Jones' death further.  (*Id.*)

Despite the MVPD's assurances, three years passed, during which time no new evidence emerged regarding Jones' death.  (*Id.* at ¶ 44.)  Garcia also alleges that, over the course of those three years, multiple prosecutors examined the evidence and

determined that there was no evidence to support charging him in connection with Jones' death.  (*Id.* at ¶ 45.)

## B.    The Renewed Investigation

In 2017, Defendant John Rosecrans was appointed MVPD Chief.  (*Id.* at ¶ 46.) Shortly after his appointment, he held a community forum.  (*Id.*)  Jennifer Kelleher attended the forum and asked Rosecrans about the investigation into her daughter's death.  (*Id.*)  Thereafter, Rosecrans promoted Officer Michael Martinez to Corporal and directed him to renew the investigation into Jones' death.  (*Id.*)  Pursuant to Rosecrans' orders, Martinez began a new investigation into Jones' death in 2018.  (*Id.*)

According to the SAC, Jones' family immediately steered Rosecrans and Martinez's renewed investigation toward their desired result: the arrest and prosecution of Garcia.  (*Id.* at ¶ 47.)  In contravention of accepted police investigatory practices, Rosecrans allegedly allowed Jennifer Kelleher to attend witness interviews and even paid for her to fly to Arizona with Martinez to interview a key witness.  (*Id.*)

At some point, Rosecrans and Martinez also set up a meeting with Dr. Lingamfelter and Dr. Kelly to discuss Jones' autopsy.  (*Id.* at ¶ 58.)[2]  The SAC alleges that Rosecrans and Martinez had been told by one of the District Attorneys they had tried to convince to indict Garcia for murder that the autopsy finding was a problem that impeded the indictment.  (*Id.*)  During the meeting with Drs. Lingamfelter and Kelly, Dr. Kelly pointedly asked Martinez and Rosecrans what new information had been discovered pertinent to Jones' cause of death.  (*Id.*)  Their response was, essentially,

---

[2] The SAC is ambiguous as to precisely when this meeting took place, but the Court assumes it was prior to the retention of Eikelenbloom and Eikelenbloom-Schieveld, as discussed below.

that there was none, just more persistence from Jones' family that they should prosecute Garcia and Rosecrans and Martinez's belief that Garcia was "not a good dude." (*Id.*) Dr. Kelly allegedly told Rosecrans and Martinez that his review of all of the evidence supported Dr. Lingamfelter's determination that Jones' cause of death was suicide, and that there was nothing regarding her death "that would distinguish it from the hundreds of suicidal hangings he had seen throughout his career." (*Id.*)

Garcia alleges that Dr. Lingamfelter also refused to change Jones' manner of death despite continued pressure from Rosecrans and Martinez to do so. (*Id.*) He allegedly told them that "the pressure campaign mounted by Ms. Jones' family did not affect the medical and scientific aspect of the case, which unequivocally demonstrated that Ms. Jones' death was a suicide." (*Id.*)

### 1.    Defendants Eikelenbloom and Eikelenbloom-Schieveld

According to the SAC, Jennifer Kelleher found two "thoroughly discredited experts," Defendants Selma Eikelenbloom-Schieveld and Richard Eikelenbloom, through a television show, *Cold Justice,*[3] and introduced them to Rosecrans and Martinez. (*Id.* at ¶ 48.) Eikelenbloom had previously been disqualified from serving as an expert in a widely publicized 2016 trial, "after the Denver District Attorney pushed him to admit on the stand that he had no direct DNA extraction or analysis experience, that he operates a lab that has not been accredited, that he personally failed his basic proficiency tests in 2011 and 2012, and that he was 'self-trained' in running DNA profiles." (*Id.* at ¶ 52.)

---

[3] The SAC also alleges that *Cold Justice* initially agreed to pay Eikelenbloom-Schieveld and Eikelenbloom "in exchange for allowing the show to film in Monte Vista," though it is unclear whether that arrangement ever came to fruition. (ECF No. 70 at ¶ 48.)

Nevertheless, at the urging of Kelleher, Rosecrans and Martinez hired Eikelenbloom-Schieveld and Eikelenbloom and paid them thousands of dollars—on top of the $3,000 that Kelleher had paid—to "procure a new autopsy with a predetermined finding that Ms. Jones' manner of death was homicide."  (*Id.* at ¶ 49.)  The SAC alleges Rosecrans and Martinez worked with Eikelenbloom and Eikelenbloom-Schieveld to hire a European doctor to purposefully produce an unscientific, non-credible autopsy that was engineered to find that Jones' death was a homicide, despite all objective evidence to the contrary.  (*Id.* at ¶ 50.)  Rosecrans and Martinez were the only two individuals that Eikelenbloom and Eikelenbloom-Schieveld spoke with prior to procuring the manipulated autopsy.  (*Id.* at ¶¶ 50–51.)  Though the SAC later adds that "[t]he only other information that Defendants Eikelenbloom and Eikelenbloom-Schieveld, and their hired European doctor, were provided and considered was what was verbally conveyed by them to Kelleher."  (*Id.* at ¶ 54.)  Garcia also alleges that Martinez "provided the discredited experts and their hired doctor with selected evidence—but made the affirmative decision not to provide them all of the relevant evidence—regarding Ms. Jones' death."  (*Id.*)

Eikelenbloom and Eikelenbloom-Schieveld additionally produced a "shoddy forensic report" that was signed and submitted by Eikelenbloom-Schieveld.  (*Id.* at ¶ 51.)[4]  Garcia alleges that, like the autopsy, the forensic report was engineered from the beginning to the predetermined outcome that he had murdered Jones—"the outcome desired by Defendants Rosecrans and Martinez but contradicted by the physical

---

[4] Garcia alleged in the FAC and argues in his briefing that the forensic report was more specifically based on a "shoddy crime scene re-creation," though the Court notes that descriptor appears to no longer be in the SAC.  (*E.g.,* ECF No. 33 at ¶ 49; ECF No. 86 at 4.)

evidence"—and was "fully based" on information provided by Rosecrans and Martinez. (*Id.*)

Dr. Lingamfelter, the El Paso County Coroner who issued the original autopsy report concluding Jones' died by suicide, would later be asked by a Deputy District Attorney about the autopsy and forensic reports procured and authored by Eikelenbloom and Eikelenbloom-Schieveld. (*Id.* at ¶ 56.) He allegedly answered that the manipulated autopsy report was authored by "some whack jobs from Europe" who were paid by the MVPD to write a report finding Jones' death was a homicide. (*Id*.) Dr. Leon Kelly, the El Paso County Coroner in 2018, would also later tell an investigator hired by Garcia's defense lawyers and testify in Court that a number of the conclusions drawn by Eikelenbloom and Eikelenbloom-Schieveld in their autopsy and forensic reports were incoherent. (*Id.* at ¶ 57.) Indeed, Dr. Kelly allegedly called one of their conclusions "the dumbest thing" he had ever heard. (*Id.*)

2.   Defendant Hunzeker

Defendant Stephen Hunzeker was appointed as the new Rio Grande County Coroner in March of 2017 and formally elected to the same role in 2018. (*Id.* at ¶ 59.) Hunzeker is not a doctor and did not graduate from college. (*Id.*) When Hunzeker was appointed Rio Grande County Coroner in March of 2017, Rosecrans and Martinez allegedly turned their pressure campaign onto him and demanded that he change the manner of death listed on Jones' death certificate from "suicide" to "homicide." (*Id.* at ¶ 60.)

According to the SAC, Jones' family also directly approached Hunzeker's family multiple times demanding the same change. (*Id.*) At one point, Hunzeker's wife coached a swim team that Jones' son was on, and Jones' father approached Hunzeker

7

at a swim meet to pressure him to change the manner of death. (*Id.*) Moreover, during an April 2021 interview with an investigator hired by Garcia's defense counsel, Hunzeker, who also runs a funeral home, admitted that he had been paid by Jones' family for her funeral services. (*Id.* at ¶ 61.) Jones' stepfather, Scott Kelleher, also sold Hunzeker his car. (*Id.*) During that sale, Kelleher lobbied Hunzeker to change the manner of death. (*Id.*)

Less than a year after he was elected coroner, on October 25, 2019, Martinez and Rosecrans met with Defendant Hunzeker to convince him to change the manner of death on Jones' death certificate from suicide to homicide. (*Id.* at ¶ 62.) During the meeting with Rosecrans and Martinez, Hunzeker told them that he would not "stick his neck out" by changing the death certificate to "homicide" because there was no objective, scientific evidence pointing to Jones' death being a homicide. (*Id.* at ¶ 63.)

But less than a month later, on November 21, 2019—and over five years after Jones died—Hunzeker filed an amendment with the State of Colorado to change Jones' manner of death on her death certificate from "suicide" to "could not be determined," despite having no new evidence regarding her cause of death. (*Id.* at ¶ 64.) Garcia alleges that Hunzeker knew changing the manner of death from suicide to "could not be determined" would cause him to be prosecuted for Jones' death. (*Id.*)

3.    Defendant Willet

According to the SAC, Rosecrans and Martinez presented the "manipulated autopsy" to Defendant District Attorney Robert Willet to "convince him to initiate charges against Mr. Garcia." (*Id.* at ¶ 50.) In addition, prior to the initiation of charges, Eikelenbloom, Eikelenbloom-Schieveld, and the European doctor they had hired attended a meeting arranged by Rosecrans and Martinez with Willet. (*Id.* at ¶ 70.)

8

Garcia alleges that Willet was aware of the independent autopsy conducted by the El Paso County Coroner's office and investigation done by officers at the time of Jones' death, (*id.*), and that he "[was] or should have been aware" that Eikelenbloom had been disqualified from serving as an expert in a widely publicized 2016 trial, (*id.* at ¶ 50.) Willet allegedly told one of the discredited experts during this meeting (or perhaps at a separate meeting around the same time) that he was not confident the case against Garcia would go to trial and, further, that the case would likely be dropped when "the democrats" took office.  (*Id.* at ¶ 75.)

After the meeting, Martinez drafted the arrest affidavit, and Defendant Willet submitted it to the court on December 2, 2020, after reviewing it.  (*Id.* at ¶ 71.)  The arrest affidavit asserted charges against Garcia for Murder in the First Degree in violation of C.R.S. § 18-3-102(1)(a)(3), Domestic Violence in violation of C.R.S. § 18-6-800.3, and Tampering with Physical Evidence in violation of C.R.S. § 18-8-610(1)(a)(b)(3).  (*Id.* at ¶ 73.)

Garcia alleges that the arrest affidavit relied upon the fabricated autopsy and forensic report by Eikelenbloom and Eikelenbloom-Schieveld but purposefully omitted other exonerating information.  (*Id.* at ¶¶ 74, 76.)  Specifically, he asserts the arrest affidavit made no mention of:

- The fact that Jones' autopsy definitively concluded that she died by suicide, or that the doctors who conducted the autopsy were adamant that it was medically impossible that Garcia had murdered Jones;
- That the coroner originally determined Jones' death was a suicide and that the death certificate was only changed to "undetermined" by a high school

> graduate after years of pressure from MVPD officers and Jones' family;

- Jones' long history of depression and suicidality;

- A traffic stop that took place the day prior to Jones' death that caused her to miss her probation meeting and led her to spiral into a deepening depressing that she would be sent back to prison;

- That Jones lost her new apartment due to her heavily re-engaged drug use immediately prior to her death, that Jones was found dead with cocaine in her system, and that her past drug use had led to prior instances of suicidal ideation and suicide attempts;

- The strong evidence that Jones was not, in fact, planning on leaving Garcia at the time of her death.

(*Id.* at ¶ 74.)

After the submission of the arrest affidavit to the court, Garcia was arrested.  (*Id.* at ¶ 76.)  He spent weeks in jail before he could post bond.  (*Id.*)  Then, he was prosecuted for years.  (*Id.*)  Garcia alleges that he was branded a murderer in his small community and villainized by local officials.  (*Id.* at ¶ 81.)  Eventually, after enduring the specter of his entire life in prison, a jury found Garcia not guilty on all counts on September 29, 2023.  (*Id.* at ¶ 82.)

Garcia filed this lawsuit in March 2025 and asserts claims against the Defendants under 42 U.S.C. § 1983 and C.R.S. § 13-21-131 for malicious prosecution in violation of the Fourth Amendment to the United States Constitution and article III, section 7 and article II, section 25 of the Colorado Constitution; deprivation of due process in violation of article II, section 25 of the Colorado Constitution; and conspiracy.  (*See generally*

ECF Nos. 1, 70.)

## II. APPLICABLE LAW

### A.    Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Thus, in ruling on a motion to dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v.*

11

*Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

"[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action,' . . . 'will not do.'"  *Robbins,* 519 F.3d at 1247 (quoting

*Twombly*, 550 U.S. at 555).

**B.    42 U.S.C. § 1983**

Section 1983 provides that a person acting under color of state law who

"subjects, or cause to be subjected, any citizen of the United States . . . to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured."  42 U.S.C. § 1983.  The statute is "not itself a source

of substantive rights, but a method for vindicating federal rights elsewhere conferred."

*Baker v. McCollan,* 433 U.S. 137, 144 n.3 (1979); *see also Brown v. Buhman,* 822 F.3d

1151, 1161 n.9 (10th Cir. 2016) (explaining "[t]here can be no 'violation' of § 1983"

because the statute "is a remedial vehicle").  "Section 1983 does not allow plaintiffs to

create a federal case out of 'every violation of state common law.'"  *Margheim v. Buljko,*

855 F.3d 1077, 1084 (10th Cir. 2017) (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1285

(10th Cir. 2004)).  Accordingly, "[t]he first inquiry in any § 1983 suit . . . is whether the

plaintiff has been deprived of a right 'secured by the Constitution and laws.'"  *Baker,* 433

U.S. at 140 (quoting 42 U.S.C. § 1983).  "In the context of a § 1983 action against

multiple individual governmental actors, it is particularly important . . . that the complaint

make clear exactly who is alleged to have done what to whom, to provide each

individual with fair notice as to the basis of the claims against him or her."  *Wilson v.

Montano,* 715 F.3d 847, 852 (10th Cir. 2013) (internal quotation marks omitted).

12

C.      Section 13-21-131[5]

In 2020, Colorado enacted the Enhance Law Enforcement Integrity Act ("ELEIA")

"to create a cause of action for individuals whose rights are secured by Article II of the

Colorado Constitution . . . and subsequently violated by a peace officer." *Shash v. City*

*of Pueblo,* 770 F. Supp. 3d 1279, 1306 (D. Colo. 2025) (citing Colo. Rev. Stat. § 13-21-

131).  Specifically, the ELEIA provides that

> [a] peace officer . . . who, under color of law, subjects or
> causes to be subjected, including failing to intervene, any
> other person to the deprivation of any individual rights that
> create binding obligations on government actors secured by
> the bill of rights, article II of the state constitution, is liable to
> the injured party for legal or equitable relief or any other
> appropriate relief.

Colo. Rev. Stat. § 13-21-131(1).  Because "[s]ection 13-21-131 is similar to 42 U.S.C. §

1983," Colorado courts "look to cases analyzing [analogous] § 1983 claims . . . as

persuasive authority." *Woodall v. Godfrey,* 553 P.3d 249, 256 (Colo. App. 2024)*; see*

*also People v. Dunaway,* 88 P.3d 619, 630 (Colo. 2004) ("Where the analogous federal

and state constitutional provisions are textually identical, we have always viewed cases

interpreting the federal constitutional provision as persuasive authority.").

### III. THE MONTE VISTA DEFENDANTS' MOTION

The Monte Vista Defendants move to dismiss Garcia's claims of malicious

prosecution in violation of federal and state law, deprivation of due process in violation

of state law, and § 1983 conspiracy.  (ECF No. 70 at ¶¶ 88–142.)  At the outset, the

---

[5] The Court takes note that Garcia states in the SAC he brings claims against the Monte Vista Defendants under state law "in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131."  (ECF No. 70 at 24 n.1; *id.* at 25 n.2.)

Court notes that Rosecrans and Martinez do not seek dismissal of Garcia's § 1983 claims based on qualified immunity.  (*See generally* ECF No. 45.)  Instead, they argue only that Garcia has failed to adequately allege a constitutional violation(s).  (*See id.*)  The Court limits its analysis accordingly.

## A.    Malicious Prosecution

Rosecrans and Martinez first argue that Garcia "has no actionable claim for malicious prosecution against [them]" under § 1983 or section 13-21-131 "because he cannot establish causation for his alleged injuries."  (*Id.* at 4.)[6]  In so arguing, the Court understands Rosecrans and Martinez to challenge only the first element of Garcia's malicious prosecution claims—that "the defendant caused the plaintiff's continued confinement or prosecution."[7]  *Margheim,* 855 F.3d at 1082 (citation and quotation marks omitted).

"With respect to a § 1983 action for malicious prosecution, 'the principal player in carrying out a prosecution . . . is not police officer but prosecutor.'"  *Calvert v. Ediger,* 415 F. App'x 80, 83 (10th Cir. 2011) (quoting *Taylor v. Meachem,* 82 F.3d 1556, 1563 n.8 (10th Cir. 1996)).  "Accordingly, an officer *typically* does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing

---

[6] Rosecrans and Martinez submit that Garcia's malicious prosecution claims under federal and state law "are considered together" "[b]ecause the factual allegations between the claims are identical."  (ECF No. 45 at 3.)  Garcia adopts the same approach in his response.  (*See generally* ECF No. 58 at 6–10.)  Thus, the Court, too, analyzes the malicious prosecution claims in tandem.  *Cf. Townley v. Mallory,* 2026 WL 764474, at *3 n.4 (D. Colo. Feb. 12, 2026) (analyzing § 1983 and section 13-21-131 claims "under the relevant federal standards" where "[b]oth Plaintiffs and Defendants treat these claims as identical to the federal claims").

[7] Though not at issue in the Motion, the remaining elements of Garcia's Fourth Amendment malicious prosecution claim are that "(2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."  *Margheim,* 855 F.3d at 1082 (citation and quotation marks omitted).

the charge and the court in issuing an indictment or warrant constitute superseding

causes that break the chain of causation." *Calvert,* 415 F. App'x at 83 (emphasis

added).

But this is not an absolute rule. "[O]fficers are not shielded from liability if a

causal connection can be established demonstrating that the prosecutor's and court's

actions were not truly independent causes." *Id.* (citing *Pierce,* 359 F.3d at 1292–93);

*see also Stonecipher v. Valles,* 759 F.3d 1134, 1147 (10th Cir. 2014) ("Of course, the

fact that a government lawyer makes the final decision to prosecute does not

automatically immunize an officer from liability for malicious prosecution."). "Most

commonly, officers can be liable for malicious prosecution if they conceal or

misrepresent material facts to the prosecutor, whose judgment was thereby influenced

by the misstatements." *Calvert,* 415 F. App'x at 83*; see also Pierce,* 359 F.3d at 1291

("[O]fficers who conceal and misrepresent material facts to the district attorney are not

insulated from a § 1983 claim for malicious prosecution simply because the prosecutor,

grand jury, trial court, and appellate court all act independently to facilitate erroneous

convictions.") (citing *Robinson v. Maruffi*, 895 F.2d 649, 655-56 (10th Cir. 1990)).

A § 1983 plaintiff "may [also] demonstrate a causal link in other ways," such as

"by showing that the officer exerted undue influence over the prosecuting authority,"

*Calvert,* 415 F. App'x at 83 (citing *Hartman v. Moore,* 547 U.S. 250, 262–63 (2006)), or

that the "officer's misrepresentations . . . cause[d] a prosecutor to lose his

independence" to the extent "those misrepresentations contribute[d] to the prosecutor's

evaluation of the case and decision to bring charges," *id.* at 85*.*

Here, Garcia argues that he has adequately alleged multiple "causal links"

15

between Rosecrans and Martinez's actions and his prosecution.  He specifically directs
the Court to his allegations that

- "At the urging of Ms. Kelleher, Defendants Rosecrans and Martinez hired
  Eikelenbloom and Eikelenbloom-Schieveld and paid them thousands of
  dollars . . . to provide a new autopsy with a predetermined finding that Ms.
  Jones' manner of death was homicide."  Rosecrans and Martinez then
  "presented this manipulated autopsy to Defendant Willet [to] convince him
  to initiate charges against Mr. Garcia."  (ECF No. 33 at ¶¶ 47–48.)

- "Eikelenbloom . . . produced a shoddy crime scene recreation" that was
  "fully based on information provided by Defendant Rosecrans and
  Martinez" and "engineered from the beginning to the predetermined
  outcome that Mr. Garcia had murdered Ms. Jones (the outcome desired
  by Defendants Rosecrans and Martinez but contradicted by the physical
  evidence)."  (*Id.* at ¶ 49.)

- "Defendant Rosecrans and Martinez continued their campaign to ensure
  that Mr. Garcia was maliciously prosecuted when Defendant Stephen
  Hunzeker was appointed as the new Rio Grande County Coroner in March
  of 2017" by "persistently demand[ing] that he change the manner of death
  listed on Ms. Jones' death certificate from suicide to homicide."  "[U]nder
  intense pressure from Defendant Martinez and Defendant Rosecrans,
  Defendant Hunzeker" ultimately acquiesced to "fil[ing] an amendment with
  the State of Colorado to change Ms. Jones' manner of death on her death
  certificate from 'suicide' to 'could not be determined,'" over five years after

Jones' death.  (*Id.* at ¶¶ 57, 61.)

- Lastly, Martinez "drafted the arrest affidavit that . . . Defendant Willet submitted . . . to the court on December 2, 2020, after reviewing it." According to the FAC, "Defendant Willet and Defendant Martinez knowingly and purposefully withheld" a litany of exculpatory evidence from the arrest affidavit and "knowingly and purposefully submitted . . . the fabricated autopsy and crime scene recreation by Eikelenbloom and Eikelenbloom-Schieveld[] to the court."  (*Id.* at ¶¶ 68–71.)

The Court agrees these allegations, if proven, are sufficient to demonstrate a constitutional violation.  The Tenth Circuit has held that officers "incur liability under a malicious-prosecution theory if they knowingly or recklessly used false information to institute legal process."  *Sanchez v. Hartley,* 810 F.3d 750, 758 (10th Cir. 2016).  Such conduct includes "prevaricat[ing] and distort[ing] evidence to convince the prosecuting authorities to press charges" and the use of "false statements" to "prevail[] upon a magistrate to issue a warrant."  *Pierce,* 359 F.3d at 1279.

Nevertheless, Rosecrans and Martinez contend that Garcia's allegations fail to establish causation because "a malicious prosecution claim against a police officer may be maintained [only] to the extent an officer conceals or misrepresents material facts to the prosecutor, essentially 'hoodwinking' them into bringing criminal charges."  (ECF No. 45 at 5.)  They argue the allegations in the SAC do not satisfy that condition because, "even under Mr. Garcia's theory of the case, Mr. Willet had possession of the same information that Mr. Martinez and Mr. Rosecrans possessed prior to the submission of criminal charges."  (*Id.*)

17

Rosecrans and Martinez principally rely on *Morphew v. Chaffee County,* 2024 WL 5673501, at *1 (D. Colo. Sept. 24, 2024), to illustrate this proposition of law.  There, Judge Daniel D. Domenico concluded the § 1983 plaintiff "failed to directly link" certain non-prosecutorial defendants to his alleged wrongful prosecution because "[n]one of the allegation against these defendants shows that they played a material role" in "the decision of the prosecutors to submit the arrest affidavit and move forward with the case when and how they did."  *Id.* at *10.  Judge Domenico noted "the allegations point to the prosecutors as ringleaders," while the non-prosecutorial defendants were "simply accused of not preventing the misleading information from being included in the affidavit (or the exculpatory information from being excluded), or not preventing the affidavit from being filed at all."  *Id.*  For instance, the plaintiff alleged that the "prosecutors . . . were responsible for authoring" the arrest affidavit, while "many of the non-prosecutorial defendants [were] only alleged to have 'edited' or 'reviewed' this document."  *Id.* at *11. What's more, the complaint alleged that one of the non-prosecutorial defendants "was actively counseling against filing the arrest affidavit in May 2021."  *Id.*

Rosecrans and Martinez essentially argue that, similar to *Morphew,* the allegations here point to Willett as—if not "ringleader"—being at least as complicit in Garcia's malicious prosecution as they are alleged to have been.  They contend "[i]t is alleged that Mr. Willet was involved in essentially every aspect of the investigation since it was re-opened in 2018, including meeting with and retaining the Eikelenblooms as forensic investigators despite the findings of the El Paso County medical examiner (ECF 33, ¶ 67), the decision to have another autopsy report prepared (*Id.,* ¶ 51), and the decision to use the evidence derived from the Eikelenblooms to pursue the prosecution

18

of Mr. Garcia, (*Id.,* ¶ 67)."  (ECF No. 45 at 4.)

The Court rejects Rosecrans and Martinez's characterization of the cited allegations.  To the contrary, the allegations pertaining to Rosecrans and Martinez are a far cry from those pertaining to the non-prosecutorial defendants in *Morphew.*  Here, Garcia alleges that Martinez and Rosecrans took it upon themselves to recruit Eikelenbloom and Eikelenbloom-Schieveld to procure and produce an "unscientific" "manipulated autopsy" and "shoddy crime scene recreation" to support their homicide theory, without Willet's involvement.  (ECF No. 33 at ¶¶ 48–49, 51–52.)  Indeed, it was seemingly only later, "[p]rior to the initiation of charges," that Rosecrans and Martinez "arranged" a meeting with Willet, "Eikelenbloom and Eikelenbloom-Schieveld[,] and the European doctor they had hired."  (*Id.* at ¶ 67.)  Further, unlike in *Morphew,* the FAC alleges that Defendant Martinez authored the arrest affidavit, and Willett merely reviewed it before submitting it to the court.  (*Id.* at ¶ 68.)

True, Judge Domenico also remarked that allegations demonstrating that the officers "duped" the prosecutors *would* have been sufficient to state a claim in *Morphew.* 2024 WL 5673501, at *10.  And it is difficult to draw such an inference here where Garcia alleges that Willet was or should have been aware that Eikelenbloom was unqualified to serve as an expert and was further aware that the affidavit submitted to the court omitted material exculpatory information.  (*See* ECF No. 33 at ¶¶ 50–51, 67.)

But, as noted above, the authority relied upon by Rosecrans and Martinez supports the proposition that a § 1983 plaintiff can "demonstrate a causal link in other ways."  *Calvert,* 415 F. App'x at 83.  For instance, it is reasonable to infer from the allegations in the SAC that Rosecrans and Martinez "exerted undue influence" over

Willet in convincing him to bring charges against Garcia.  *Id.*  And that is to say nothing of the fact that Martinez's affidavit also independently misled the court.  *Dorsey v. City of Shawnee, Kansas,* 2025 WL 1125565, at *3 (D. Kan. Apr. 16, 2025) ("[A]llegations that an officer 'prevaricate[d] and distort[ed] evidence' or supplied 'false statements' that caused a 'magistrate to issue a warrant' are sufficient to allege personal participation in a § 1983 malicious-prosecution violation.").

Accordingly, the Monte Vista Defendants' Motion is denied to the extent it seeks dismissal of Garcia's claims against Rosecrans and Martinez for malicious prosecution under federal and state law.

## B.      Violation of Due Process

Garcia's state law due process claim alleges that Rosecrans and Martinez "deprived [him] of his constitutional right to due process and a fair trial" insofar as they "used investigative techniques that were so coercive and abusive that they knew, or were deliberately indifferent to, the fact that those techniques would yield false information that was used to attempt to convict [Garcia]."  (ECF No. 70 at ¶¶ 124–25.) Rosecrans and Martinez move to dismiss this claim on three grounds.

First, they argue that Garcia's due process claim is barred by the applicable statute of limitations.  (ECF No. 45 at 7.)  A civil action brought pursuant to section 13-21-131 "must be commenced within two years after the cause of action accrues." C.R.S. § 13-21-131(5).  Rosecrans and Martinez submit that, "[a]s alleged in the Complaint, the last action taken by any of [them] was on December 2, 2020, when the arrest warrant affidavit was drafted by Mr. Martinez and submitted to the court by Mr. Willet."  (ECF No. 45 at 7 (quoting ECF No. 33 ¶ 68).)  They accordingly argue that Garcia's lawsuit was untimely when filed in March 2025 because Garcia was "aware of

20

the alleged 'investigative techniques' and 'misconduct' that led to his arrest by affidavit in December 2020."  (ECF No. 45 at 7.)

Garcia counterargues, however, that his "state due process claim under the ELEIA" is "predicated on the same unconstitutional conduct as his state malicious prosecution claim."  (ECF No. 58 at 11.)  And his state law due process claim accrued when he was acquitted, on September 29, 2023.  *See Kimball v. Fox,* 2023 WL 2163568, at *8 (D. Colo. Feb. 22, 2023) (finding § 1983 plaintiff's state malicious prosecution claim accrued when he was acquitted).  Garcia accordingly argues that "[i]t would be illogical" to find his parallel state due process claim under the ELEIA predicated on the same conduct was time-barred well before he could bring suit for malicious prosecution.  (ECF No. 58 at 11.)

The Court agrees with Garcia.  Though he does not label it as such, Garcia's due process claim, as pled, is substantively analogous to a Fourteenth Amendment fabrication-of-evidence claim.  In *McDonough v. Smith,* the Supreme Court directly analogized a fabricated-evidence claim to the common law tort of malicious prosecution and thereby concluded the plaintiff "could not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution."  588 U.S. 109, 117–18 (2019). It reasoned that a claim "asserting that fabricated evidence was used to pursue a criminal judgment" implicates the same "pragmatic concerns" underlying "malicious prosecution's favorable-termination requirement": "avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments."  *Id.*

The Court finds the Supreme Court's holding in *McDonough* instructive on this

21

issue, and concludes that Garcia's due process claim likewise accrued when he was acquitted in September 2023. Plainly, therefore, this claim is not barred by the applicable statute of limitations.

Second, Rosecrans and Martinez argue that Garcia's due process claim fails on the merits because he "cannot show he was deprived of a fair trial for the simple reason that he was not convicted." (ECF No. 45 at 8.) They rely on Tenth Circuit precedent holding that, in the context of a *Brady* claim, "[r]egardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial." *Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir. 1999); *see also Tiscareno v. Frasier,* 603 F. App'x 672, 679 (10th Cir. 2015) (no *Brady* claim absent conviction); *Bailey v. Twomey,* 791 F. App'x 724, 735 (10th Cir. 2019) (declining to reconsider *Morgan* where § 1983 plaintiff failed to identify intervening Supreme Court authority).

Garcia does not refute the holdings of the Tenth Circuit authority relied upon by Rosecrans and Martinez. But he emphasizes that he brings his state law due process claim under the Colorado Constitution and thus submits that "Colorado, not federal, law informs this Court's analysis." (ECF No. 58 at 11.)

Particularly at this early stage of the litigation, the Court declines to dismiss Garcia's state law due process claim based solely on arguably adverse federal precedent especially where, as here, such precedent is not directly on point. While it is true that as a general matter Colorado courts look to federal § 1983 caselaw as *persuasive* authority, *see Woodall,* 553 P.3d at 256, it remains steadfastly the case that Tenth Circuit authority ultimately is *not* binding on this Court's consideration of Garcia's

due process claim brought pursuant to the *Colorado* Constitution.

Indeed, the Colorado Supreme Court has, on several occasions, "determined that the Colorado Constitution provides more protections for our citizens than do similarly or identically worded provisions of the United States Constitution*." People v. Young,* 814 P.2d 834, 842–43 (Colo. 1991); *see also People ex rel. Juhan v. District Court for Jefferson County,* 165 Colo. 253, 261 (Colo. 1968) ("the United States Constitution . . . does [n]ot say that a state has no right, under its state due process clause, to create protections for citizens which might not be required under the federal concept"). Moreover, Rosecrans and Martinez fail to cite any Colorado authority for the proposition that a state law due process claim predicated on the denial of a right to a fair trial can only stand if a judgment of conviction has entered. By contrast, Garcia has directed the Court to Colorado caselaw analyzing pre-conviction due process claims based on the withholding of evidence. *See People v. Braunthal,* 31 P.3d 167, 172 (Colo. 2001) (considering merits of due process claim based on "the prosecution's failure to preserve evidence" in interlocutory appeal).

Further, the Court questions the firmness of the Tenth Circuit's reasoning in *Morgan* that a due process claim requires a judgment of conviction as a matter of even federal law. The Supreme Court's decision in *McDonough* instead suggests all that is required is a deprivation of liberty. 588 U.S. at 114–121 (finding § 1983 plaintiff had timely asserted a fabrication of evidence claim under the Fourteenth Amendment where the first trial ended in a mistrial and the second trial ended in acquittal); *see also Armstrong v. Daily,* 786 F.3d 529, 554–55 (7th Cir. 2015) (disagreeing with *Morgan* because the Tenth Circuit did not consider "a pretrial deprivation of liberty resulting from

23

the bad-faith destruction of evidence").

Lastly, Rosecrans and Martinez argue that Garcia's due process claim fails "because he does not allege any facts regarding the Monte Vista Defendants' involvement at trial."  (ECF No. 45 at 8.)  However, Rosecrans and Martinez cite no authority supporting that their "personal involvement in any alleged conduct at trial" is a required element of Garcia's state law due process claim.

For all these reasons Rosecrans and Martinez's Motion is denied to the extent they seek dismissal of Garcia's state law due process claim.

## C.    *Monell* Liability

Lastly, the City moves to dismiss Garcia's § 1983 malicious prosecution and conspiracy claims on the grounds that his allegations of *Monell* liability "amount to nothing more than conclusory statements."  (ECF No. 45 at 9.)

"In order to state a claim for municipal liability under § 1983, a plaintiff must allege (1) the existence of an official policy or custom; and (2) that the official policy or custom was the driving force behind the constitutional violation alleged."  *Marshall v. Dix,* 640 F. Supp. 3d 1033, 1067 (D. Colo. 2022).  Under Tenth Circuit precedent, an official policy can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

24

*Waller v. City & County of Denver,* 932 F.3d 1277, 1283 (10th Cir. 2019) (quotation

marks omitted).

The SAC appears to invoke several of these theories, though the City contends

none of Garcia's allegations pass muster under Rule 12(b)(6).

### 1.    Informal Custom

"[A]n act performed pursuant to a custom that has not been formally approved by

an appropriate decisionmaker may fairly subject a municipality to liability on the theory

that the relevant practice is so widespread as to have the force of law." *Bd. of County*

*Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 404 (1997) (internal quotation

marks omitted).  "With formal, unwritten policies, customs, or practices, the plaintiff can

plead a pattern of multiple similar instances of misconduct; 'no set number is required,

and the more unique the misconduct is, and the more similar the incidents are to one

another, the smaller the required number will be to render the alleged policy plausible.'"

*Arakji v. Hess,* 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City*

*of Albuquerque,* 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

In the FAC, Garcia alleges that the City "has imposed no discipline on the MVPD

Individual Defendants for their unconstitutional actions against Mr. Garcia," which is

consistent with its "custom and practice of tolerating and ratifying such unconstitutional

conduct . . . ."  (ECF No. 33 at ¶¶ 80–81.)  The City argues these allegations are

insufficient to establish "a widespread practice amounting to a custom" because Garcia

has failed to plead prior examples of similar conduct.  (ECF No. 45 at 9.)  The Court

agrees with the City.

The informal custom alleged in the FAC appears to be the City's alleged

widespread practice of "tolerating and ratifying" the "unconstitutional conduct" of MVPD

officers.  (ECF No. 33 at ¶ 80.)  But Garcia describes no other instances of similar conduct apart from the City's failure to "discipline . . . the MVPD Individual Defendants for their unconstitutional actions against Mr. Garcia."  *Cf. Waller,* 932 F.3d at 1290 (allegations "describing only one similar incident . . . fall[s] far short of plausibly alleging a 'widespread practice'").

Garcia elaborates in his response that his informal custom theory encompasses the "series of decisions" MVPD officials and officers made "[a]cross many years" to maliciously prosecute him, and for which "no MVPD official was ever disciplined for their clearly unconstitutional actions."  (ECF No. 58 at 13.)  The Court thus understands Garcia to argue that the informal custom here is based on an alleged pattern of conduct throughout the investigation and prosecution of the case against him.  In support, he cites several decisions supporting the notion that an informal custom amounting to a widespread practice can be shown through repeated violation of a single individual's constitutional rights.

The Court is unpersuaded, however, that the MVPD officers' alleged efforts to fabricate evidence to facilitate the prosecution of Garcia, and the City's alleged failure to discipline them for such conduct, represents a "pattern of multiple similar instances of conduct," as opposed to a series of distinct decisions made in furtherance of a single prosecution against Garcia.  Indeed, none of the cases cited by Garcia involved the factual circumstances at issue here, where a series of different decisions contributed to a single alleged malicious prosecution of a single defendant.  *See Arakji v. Hess,* 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (finding plaintiff sufficiently alleged a pattern or custom where he alleged, "with a high degree of factual specificity, incidents on

twelve occasions within a one-year period" during which "numerous Broomfield police officers persistently harassed him while he slept in his car"); *Jacoby v. DuPage County Ill.,* 2013 WL 3233339, at *3 (N.D. Ill. June 26, 2013) (finding plaintiff alleged sufficient facts to infer "a widespread practice that had the force of policy to disregard the legitimate medical needs of detainees" where he alleged that "he made repeated complaints over an 11-day period and that he was repeatedly denied medical care"); *Rykard v. City of Dothan,* 2011 WL 3875609, at *3 (M.D. Ala. Aug. 9, 2011) (finding plaintiff alleged sufficient facts to infer a "customer or practice of city jail personnel failing to give prisoners the medication" where she alleged she "informed numerous jail personnel of her worsening medical condition and all these personnel ignored and neglected her over some period of time").

Accordingly, the Court finds Garcia has failed to plausibly allege a *Monell* claim predicated on an informal custom amounting to a widespread practice. Garcia's claims against the City are accordingly dismissed without prejudice to the extent they are predicated on that theory.

### 2. Failure to Train / Supervise

In the FAC, Garcia also appeared to allege a *Monell* theory of liability based on the City's failure to train or supervise its officers. (*See* ECF No. 33 at ¶ 98 ("Defendant Monte Vista's training, supervision, and discipline caused the violation of Plaintiff's constitutional rights."). The City moved to dismiss the claim on the grounds that the FAC "does not identify what training the officers had, what training was constitutionally required, and how the City was on notice of these deficiencies such that it was deliberately indifferent," nor "any specific supervisory deficiencies." (ECF No. 45 at 10.)

Garcia failed to address any *Monell* theory of liability based on the City's alleged

27

failure to train or supervise MVPD officers in his response.  (*See generally* ECF No. 58 at 12–15.)  Accordingly, the Court deems him to have abandoned any such claim.  *See C1.G on behalf of C.G. v. Siegfried,* 38 F.4th 1270, 1282 (10th Cir. 2022) (affirming dismissal of claim because plaintiff "abandoned it by not addressing it in his response to Defendants' motion to dismiss").

The City's Motion is thus granted to the extent that Garcia alleges a *Monell* claim based on the City's failure to train or supervise.

3.     Decisions of Final Policymaker

The City next moves to dismiss Garcia's claim that it is subject to *Monell* liability for decisions made by those with final policymaking authority—or here, decisions made by Rosecrans.  (ECF No. 45 at 10–12.)

Municipalities are responsible for "actions taken by final policymakers, whose conduct 'can be no less described as the official policy of a municipality.'"  *Whitson v. Bd. of County Comm'rs of County of Sedgwick,* 106 F.4th 1063, 1066–67 (10th Cir. 2024) (quoting *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City,* 779 F.3d 1141, 1159 (10th Cir. 2015) (internal quotation marks omitted)); *see also Simmons v. Uintah Health Care Special Dist.,* 506 F.3d 1281, 1283 (10th Cir. 2007) (Municipalities are "equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules."); *id.* at 1287 ("Actions taken by a municipality's final policymakers, even in contravention of their own written policies, are fairly attributable to the municipality and can give rise to liability.").

"The motive of the policymaker is irrelevant.  The important thing is that the policymaker is responsible for an unconstitutional act."  *Whitson,* 106 F.4th at 1067.  As summarized by the Supreme Court:

> [P]roof that a municipality's legislative body or *authorized decisionmaker* has intentionally deprived a plaintiff of a federally protected right *necessarily establishes* that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality *or is authorized decisionmaker itself violates federal law* will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Brown,* 520 U.S. at 405 (emphasis added).

Garcia alleges that "Defendant Rosecrans is the final policymaker for all actions by the MVPD."  (ECF No. 33 at ¶ 82.)  The FAC quotes the Monte Vista Municipal Code, which charges the Chief of Police "with the duty of crime prevention, crime detection, criminal apprehension, police records, traffic control and the efficient conduct of the Police Department generally," as well the duty to "see that the applicable ordinances of the City and the laws of the State are duly enforced and the rules and regulations of the Police Department obeyed."  (*Id.* (quoting Monte Vista Mun. Code § 2-6-30).)  The Court finds it reasonable to infer from this allegation that Rosecrans "retain[ed] complete authority over how criminal investigations are conducted" during his tenure as police chief.  *Logan v. City of Evanston,* 2020 WL 6020487, at *6 (C.D. Ill. Sept. 29, 2023).

The City notably "concedes only for purposes of this Motion that . . . when employed as Chief of Police, Mr. Rosecrans was the final policymaker for certain responsibilities of the police department."  (ECF No. 45 at 11 n.1.)  But it argues Garcia "does not plead facts showing that Mr. Rosecrans was sufficiently involved in the actual initiation of the prosecution."  (*Id.* at 11.)  The Court disagrees.  The FAC alleges that Rosecrans "authorized, condoned, and continued the malicious prosecution of Mr. Garcia without probable cause" through several acts, (ECF No. 33 at ¶ 83), including by

making the decision to renew the investigation into Jones' death in 2017, hiring and then working with Eikelenbloom and Eikelenbloom-Schieveld to produce a "manipulated autopsy" supporting charges against Garcia, and pressuring the newly-elected coroner to change the manner of death on Jones' death certificate, (*id.* at ¶¶ 44, 45, 48–51, 54–57, 61, 62). These allegations are, in the Court's view, sufficient to allege that Rosecrans, as a final policymaker, was himself a direct participant in and responsible for the alleged violation of Garcia's Fourth Amendment rights.

Accordingly, the City's Motion is denied to the extent Garcia's *Monell* claim is predicated on liability for decisions made by Rosecrans, as a final policymaker.

4.     Ratification

Lastly, the City moves to dismiss any *Monell* theory of liability claim predicated on Rosecrans' delegation of final policymaking authority to Martinez in connection with the renewed investigation of Jones' death, and his ratification of decisions Martinez made in the course thereof. (ECF No. 45 at 12.)

"Ratification can be found when the employees were given authority for the action, subject to the review and approval of a final policymaker, and when the final policymaker approves of the decision and the basis for the decision." *Cobruno v. Diggins,* 2018 WL 10215848, at *10 (D. Colo. 2018) (citing *Brammer-Hoelter v. Twin Peaks Charter Academy,* 602 F.3d 1174, 1189 (10th Cir. 2010)). "The final decisionmakers' approval must precede the violative action, and the Tenth Circuit has rejected ratification based on conduct after the violation has occurred." *Lucio-Vasquez v. City of Aurora,* 2023 WL 2891009, at *10 (D. Colo. Apr. 11, 2023) (citing *Cordova v. Aragon,* 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow

caused that violation.") (emphasis in original).

The City directs the Court's attention to Garcia's allegation that Martinez "was designated with final policymaking authority by MVPD to investigate Ms. Jones' death, hire experts that fabricated evidence, pressure Defendant Hunzeker to change the manner of death on Ms. Jones' death certificate, and author the arrest affidavit that intentionally omitted exonerating information and included the fabricated evidence obtained from the discredited experts hired by MVPD." (ECF No. 33 at ¶ 84.)  It asserts this allegation is "conclusory" and "fails to identify any plausible facts showing who made this designation, when it was made, and the scope of authority allegedly transferred to Mr. Martinez." (ECF No. 45 at 12.)

However, the City's argument ignores that, earlier in the FAC, Garcia alleged that "Rosecrans promoted MVPD Officer Michael Martinez to Corporal and assigned him to renew the investigation into the death of Ms. Jones." (ECF No. 33 at ¶ 44.)  The FAC also alleges that Rosecrans and Martinez together hired Eikelenbloom and Eikelenbloom-Schieveld to procure and produce the fabricated autopsy and forensic reports, and together pressured Hunzeker to amend Jones' death certificate.  (*Id.* at ¶¶ 47–48, 57, 59.)  Thus, to the extent Martinez bore any responsibility for such decisions, the Court can infer from these allegations that Rosecrans approved of Martinez's decisions and the basis for them.

As to the arrest affidavit, on the other hand, Garcia alleges that Martinez "submitted the arrest affidavit with the explicit approval of final policymakers at the MVPD, including the chief of police." (*Id.* at ¶ 69.)  He avers that "[t]he death of Ms. Jones was so high-profile that Defendant Martinez could not have submitted the arrest

31

affidavit without the approval of the final policymakers for the MVPD." (*Id.*)  The City

argues this allegation is too speculative to pass muster under *Iqbal / Twombly.*  (ECF

No. 45 at 11.)  And the Court agrees.  Garcia's speculative allegation that Jones' death

was "so high profile" that the arrest affidavit must have been approved by a final

policymaker does not plausibly allege that a final policymaker actually approved the

contents of the arrest affidavit, nor the reasons he chose to include or exclude certain

information in the affidavit.[8]

Accordingly, to the extent Garcia's *Monell* claim against the City is predicated on

a theory that a final policymaker ratified Martinez's decisions to "hire experts that

fabricated evidence" and "pressure Defendant Hunzeker to change the manner of death

on Ms. Jones' death certificate," (ECF No. 33 at ¶ 84), the City's Motion is denied.

However, to the extent Garcia's *Monell* claim is predicated on a theory that a final

policymaker ratified the contents of the arrest affidavit authored by Martinez, (*see id.*),

the Motion is granted and Garcia's *Monell* claim is dismissed without prejudice to the

same extent.

### IV. WILLET'S MOTION

Garcia brings two claims against Willet under § 1983 for malicious prosecution

and conspiracy.  Willet argues both claims should be dismissed because he enjoys

absolute prosecutorial immunity.  (ECF No. 51 at 4–9.)  He additionally argues that

Garcia has not plausibly alleged a § 1983 conspiracy.  (*Id.* at 9–10.)  Ultimately, the

---

[8] The City also urges the Court to take judicial notice of a separation letter from the City
Manager evidencing that Rosecrans left his employment with the MVPD before Martinez
authored the arrest affidavit and it was submitted to the court.  (ECF No. 45 at 11–12; *id.* at 11
n.2; ECF No. 45-1.)  The Court need not consider the letter to resolve the Motion and thus
declines to take judicial notice of its contents.

Court agrees that both claims are subject to dismissal, primarily because the allegations in the SAC do not plausibly support the theory of Willet's liability that Garcia argues in his response.

With respect to Willet's assertion of absolute prosecutorial immunity, the Court notes at the outset that Garcia acknowledges in his response that the SAC "contains allegations concerning Defendant Willett's prosecutorial misconduct for which it is arguable that he would be entitled to absolute immunity." (ECF No. 56 at 12.) He clarifies, however, that his claims against Willet are based specifically "on his participation in the fabrication and manipulation of evidence, in the form of false autopsy and crime scene recreation reports authored by the discredited experts and the pressure that was imposed on the coroner to change Ms. Jones' death certificate." (*Id.* at 9.)

The Court accordingly gathers from Garcia's response that he is not contesting that Willet would be entitled to absolute immunity for other conduct alleged in the SAC, including his act of submitting the arrest affidavit to the court (without, notably, averring to the veracity of the contents thereof), *see Kalina v. Fletcher,* 522 U.S. 118, 125–29 (1997), nor for his *use* of fabricated evidence to support charges against Garcia, *see Imbler v. Pachtman,* 424 U.S. 409, 416 (1976). (*See also* ECF No. 56 at 9 (arguing in response that, "as alleged, Defendant Willet 'did not just use [evidence ] he should have known or suspected to be false' but instead 'sought to *create* that false' evidence," (quoting *Endicott-Quinones v. Garza,* 2024 WL 1299561, at *5 (D.N.M. Mar. 27 2024))).

With regard to the conduct that Garcia says his claim against Willet *is* based on—"the act of fabricating and manipulating evidence," (ECF No. 56 at 9)—the Court in

principle agrees with Garcia that prosecutors are not entitled to absolute immunity when they work alongside police to manufacture false evidence during the preliminary investigation of a crime. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 272–76 (1993). But it cannot agree that the SAC plausibly alleges that is what Willet has done here.[9]

Regarding the "false autopsy and crime scene recreation reports," Garcia alleges that "*Defendants Rosecrans and Martinez* hired Defendants Eikelenbloom and Eikelenbloom-Schieveld . . . to procure a new autopsy with a predetermined finding that Ms. Jones' manner of death was homicide." (ECF No. 70 at ¶ 49 (emphasis added).) What's more, he expressly alleges that "[t]he only two individuals that Defendants Eikelenbloom and Eikelenbloom-Schieveld spoke with prior to procuring the manipulated autopsy were Defendants Rosescrans and Martinez." (*Id.* at ¶ 50.) Likewise, the "shoddy forensic report" produced by Defendants Eikelenbloom and Eikelenbloom-Schieveld . . . was fully based on information provided by *Defendants Rosecrans and Martinez.*" (*Id.* at ¶ 51 (emphasis added).)

Indeed, it was seemingly only after Eikelenbloom and Eikelenbloom-Schieveled's report was already complete that "Defendants Rosecrans and Martinez presented this manipulated autopsy to Defendant Willet [to] convince him to initiate charges against Mr. Garcia." (*Id.* at ¶ 50.) Then, at some later point

> [p]rior to the initiation of charges, the District Attorney's
> Office, including Defendant Robert Willet, was involved in
> meeting with Eikelenbloom, Eikelenbloom-Schieveld, and
> the European doctor they had hired that was arranged by

---

[9] Though the Court acknowledges it is somewhat ambiguous whether Willet is moving to dismiss Garcia's malicious prosecution claim for failure to state a claim or only on the basis of prosecutorial immunity, neither is Garcia permitted to "amend [his] complaint by adding factual allegations in response to Defendant's motion to dismiss." *Abdulina v. Eberl's Temporary Servs., Inc.,* 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).

> Defendants Rosecrans and Martinez. Defendant Willett
> engaged with these individuals in an investigative and/or
> administrative capacity, outside of his role in initiating a
> prosecution or presenting the State's case.

(ECF No. 33 at ¶ 67.) Garcia's conclusory allegation that Willet participated in this meeting in an "investigative and/or administrative capacity," however, is not enough for the Court to reasonably infer he worked alongside Rosecrans and Martinez in an investigative capacity to fabricate or manipulate the autopsy and crime scene recreation reports. While it is *possible* that Willet participated in this meeting in an investigative capacity, Garcia alleges no further details regarding the purpose of the meeting, any topic that was discussed at the meeting, or the outcome of the meeting that are sufficient to make such an inference *plausible*. *Cf. Spinelli v. Byars,* 2025 WL 2996640, at *7 (D. Colo. Oct. 24, 2025) (finding vague allegations regarding a meeting between the prosecutor and witness were insufficient to state a fabrication of evidence claim).

Garcia's assertion that Willet "participat[ed] in the fabrication and manipulation of evidence" via "the pressure that was imposed on the coroner to change Ms. Jones' death certificate" fares no better. (ECF No. 56 at 9.) The SAC similarly alleges that "*Defendants Rosecrans and Martinez* persistently demanded that [Hunzeker] change the manner of death listed on Ms. Jones' death certificate from suicide to homicide." (ECF No. 70 at ¶ 60 (emphasis added); *id.* at ¶¶ 62–67.) But the Court has identified *no* allegations in the SAC pertaining to Willet's involvement in pressuring Hunzeker to amend Jones' death certificate, and Garcia directs it to none.

Garcia's conspiracy claim under § 1983 also requires him to "allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 533 (10th Cir. 1998); *see also United States v.*

35

*Edmonson,* 962 F.2d 1535, 1548 (10th Cir. 1992) ("a defendant's assent can be inferred from acts furthering the conspiracy's purpose").  Garcia argues that Willet "actively participated" in "a plan to fabricate and manipulate evidence with the express purpose of ensuring that [Garcia] was charged and prosecuted" for Jones' death by "attending meetings meant to ensure that the evidence was fabricated and manipulated, and then using that fabricated and manipulated evidence to later prosecute Mr. Garcia."  (ECF No. 56 at 13.)

As discussed above, however, Garcia's allegations pertaining to the meeting Willet attended with Rosecrans, Martinez, Eikelenbloom, and Eikelenbloom-Schieveld are too vague for the Court to infer the purpose of the meeting was "to ensure that the evidence was fabricated and manipulated." *Contra Bledsoe v. Jefferson County, Kan.,* 275 F. Supp. 3d 1240, 1259 (D. Kan. 2017) (where, among other allegations, plaintiff alleged that prosecutor participated in a meeting with other defendants at which they "discussed a plan that Tom should recant his confession and inform authorities that plaintiff had confessed to the murder").

Moreover, the Court is disinclined to infer Willet's assent to a plan to fabricate and manipulate evidence against Garcia based solely on his "using the fabricated and manipulated evidence to later prosecute Mr. Garcia," when he would otherwise be absolutely immune to a malicious prosecution claim predicated on that same conduct. *See Marshall,* 640 F. Supp. 3d at 1062, 1062 n.17 (concluding plaintiff "necessarily cannot state a conspiracy claim" against prosecutor with respect, for example, to "any conspiracy to violate Plaintiff's constitutional rights based on the failure to include material facts in the Arrest Warrant Affidavit," for which the prosecutor was entitled to

36

absolute immunity) (citing *N.E.L. v. Douglas Cnty.,* 740 App'x 920, 931 n.22 (10th Cir. 2018)); *see also Glaser v. City and County of Denver, Colo.,* 557 F. App'x 689, 705 (10th Cir. 2014) ("[A] prosecutor is shielded by absolute immunity from claims that he knowingly used false testimony and suppressed material evidence in a trial.").

Accordingly, the Court finds that Garcia has not plausibly alleged a malicious prosecution claim against Willet based on his participation in the fabrication and manipulation of evidence against Garcia, nor has he plausibly alleged that Willet conspired with Rosecrans, Martinez, Eikelenbloom, and/or Eikelenbloom-Schieveld to fabricate and manipulate evidence against Garcia. For the same reason, Willet's Motion is granted, and the claims against him are dismissed without prejudice.[10]

## V. HUNZEKER'S MOTION

Hunzeker moves to dismiss Garcia's § 1983 claims against him for malicious prosecution and conspiracy on the grounds of qualified immunity.

"A § 1983 defendant's assertion of qualified immunity is an 'affirmative defense [that] creates a presumption that the defendant is immune from suit.'" *Truman v. Orem City,* 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Est. of Smart by Smart v. City of Wichita,* 951 F.3d 1161, 1168 (10th Cir. 2020)). "To overcome this presumption, the plaintiff must show (1) the defendant's actions violated a constitutional or statutory right,

---

[10] The Court also notes that Willet appended the arrest affidavit initiating charges against Garcia to his reply to refute Garcia's contention that Willet "knowingly advanced a false narrative in the arrest affidavit." (ECF No. 71 at 6.) Willet urges the Court that it may consider the arrest affidavit without converting his Motion to a motion for summary judgment because it is referenced in Garcia's complaint and is additionally a public record of which the Court can take judicial notice. (*Id.* at 7 n.4.) Like the separation letter submitted by Rosecrans and Martinez, however, the Court does not need to consider the arrest affidavit to resolve the Motion and it thus declines to do so at this stage.

and (2) that right was clearly established at the time of the defendant's complained-of conduct." *Truman,* 1 F.4th at 1235.

"District courts may grant a motion to dismiss based on qualified immunity, but asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (cleaned up). "[T]he Court analyzes the defendant's conduct *as alleged in the complaint.*" *Id.* (cleaned up) (emphasis in original).

The Court considers both prongs of the qualified immunity analysis with respect to Garcia's malicious prosecution and conspiracy claims against Hunzeker below.

## A. Malicious Prosecution

### 1. Constitutional Violation

Like Rosecrans and Martinez, Hunzeker challenges only the first element of Garcia's malicious prosecution claim against him—that Hunzeker "caused the plaintiff's continued confinement or prosecution." *Margheim,* 855 F.3d at 1085 (citation omitted). (*See* ECF No. 53 at 4–5.) The substance of Hunzeker's arguments, too, mirrors much of Rosecrans and Martinez's arguments with respect to causation. He contends he cannot be liable for malicious prosecution because he "did not arrest or prosecute Plaintiff, nor would that be within his authority or duties as coroner," (*id.* at 5), and "the issuance of the arrest affidavit was an intervening cause that severed any possible liability for Mr. Hunzeker, who is not alleged to have participated in preparing the arrest affidavit or charging Plaintiff." (ECF No. 53 at 8.)

But Garcia cites caselaw supporting that "a coroner's reckless or intentional falsification of any autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth

Amendment." *Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119, 1126–27 (9th Cir. 2002). In *Galbraith,* a case with remarkably similar background facts to this one, the § 1983 plaintiff claimed that the coroner "recklessly disregarded the truth by asserting in his autopsy report that [the plaintiff's wife] was strangled by an assailant while ignoring abundant evidence that pointed to suicide." *Id.* at 1127. In the complaint, the plaintiff alleged "deficiencies in the autopsy report itself tending to indicate that [the coroner] never did the work he claimed he had done to support his conclusion that [the wife's] death was caused by an assailant." *Id.* Moreover, the complaint alleged that "[the coroner] deliberately lied about the autopsy in the autopsy report, in his communications with other investigators, and on the witness stand at the preliminary hearing in order to cover up his incompetence, and that these lies proximately caused [the plaintiff's] arrest and prosecution for murder." *Id.* Such allegations were, in the Ninth Circuit's view, adequate to allege a Fourth Amendment violation. *Id.*

In another case cited by Garcia, the Northern District of New York concluded a § 1983 plaintiff had plausibly alleged a malicious prosecution claim against a medical examiner notwithstanding the examiner's argument that he "was nothing more than a potential witness and was not responsible for making the critical decision to prosecute." *Davis-Guider v. City of Troy,* 2019 WL 1101278, at *1, *4 (N.D.N.Y. Mar. 8, 2019). The district court specifically found the plaintiff sufficiently alleged that the examiner "initiated the criminal proceeding," the first element of his malicious prosecution claim, where the complaint alleged the examiner "ignored evidence that contradicted his findings, omitted key information from his autopsy report, improperly documented that V.D.'s cause of death was homicide, and that his report was the only evidence used to support the

39

decision to prosecute."  *Id.* at *5.

Other district courts have reasoned similarly.  *See Thomas v. City of Troy,* 293 F. Supp. 3d 282, 294 (N.D.N.Y. 2018) (plaintiff sufficiently alleged that medical examiner initiated or continued the criminal proceeding as required to state malicious prosecution claim where complaint alleged that the examiner "created a false autopsy report, improperly documented that Matthew's cause of death as a homicide, and provided that report to the prosecutor"); *Sommer v. United States,* 713 F. Supp. 2d 1191, 1205 (S.D. Cal. 2010) (plaintiff sufficiently stated "a § 1983 claim for deprivation of liberty by the reckless or deliberate falsification of evidence in violation of the Fourth Amendment" where he alleged that that coroner "deliberately or recklessly falsified Todd Sommer's cause of death on the death certificate" and the "determination that Todd Sommer had been poisoned was central to Plaintiff's arrest and prosecution").

Similar to the allegations discussed in the foregoing authorities, Garcia alleges here that, "over five years after Ms. Jones died," "Hunzeker filed an amendment with the State of Colorado to change Ms. Jones' manner of death on her death certificate from 'suicide' to 'could not be determined,'" after enduring over two years of pressure from Rosecrans, Martinez, and Jones' family to do so, (ECF No. 33 at ¶¶ 56–61).  Garcia alleges there was "no new evidence" to support the amendment, and that Hunzeker had refused to change Jones' manner of death to homicide on at least one prior occasion "because he was 'not comfortable that there was enough evidence to change it to homicide.'"  (*Id.* at ¶ 60.)  According to Garcia, Hunzeker knew "his actions would cause Mr. Garcia's prosecution, that there had not been enough evidence to change Ms. Jones' cause of death to homicide, and that there was no new evidence that would

40

support changing Ms. Jones' manner of death to 'could not be determine[d.]'"  (*Id.* at

¶ 61.)  And, based on Garcia's description of the arrest affidavit and the information

omitted therefrom, the Court can reasonably infer the amended death certificate was an

important piece of evidence supporting probable cause to arrest Garcia on homicide

charges.  (*Id.* at ¶ 71.)

Hunzeker nonetheless argues that his "alleged action of amending the death

certificate in November 2019 is too remote in time . . . to show a plausible causal

connection with Plaintiff's arrest in December 2020 and subsequent prosecution through

September 2023."  (ECF No. 53 at 16.)  He cites no authority in support of this

argument and it is, in the Court's view, wholly unconvincing.  It would be nonsensical to

conclude a defendant can avoid liability for fabricating evidence with knowing or

reckless disregard of the truth because causation is severed if it takes several months

thereafter for the police to conclude their investigation and the prosecutor to assemble

the case and present the evidence to the court.

Similar to Rosecrans and Martinez, Hunzeker also argues "there are no

allegations that Mr. Hunzeker 'hoodwinked' anyone about his actions."  (ECF No. 53 at

6.)  As discussed above, *Calvert* establishes that a § 1983 plaintiff "may [also]

demonstrate a causal link in other ways," such as "by showing that the [defendant]

exerted undue influence over the prosecuting authority," *Calvert,* 415 F. App'x at 83

(citing *Hartman,* 547 U.S. at 262–63), or that the "officer's misrepresentations . . .

cause[d] a prosecutor to lose his independence" to the extent "those misrepresentations

contribute[d] to the prosecutor's evaluation of the case and decision to bring charges,"

*id.* at 85*.*

41

Here, Garcia avers that "Defendant Hunzeker's change of the death certificate from 'suicide' to 'could not be determined' concealed, obfuscated, disregarded, and misrepresented material and potentially exculpatory facts to both prosecutors for the case and the criminal court where Mr. Garcia would later be prosecuted."  (ECF No. 33 at ¶ 63.)  Thus, even to the extent Willet was aware of the prior autopsy concluding Jones' death was a suicide, (ECF No. 33 at ¶ 67), it is reasonable to infer Hunzeker's amendment of the death certificate caused Willet to lose his independence and contributed to his evaluation of the case, *Calvert,* 415 F. App'x at 85—and that is to again say nothing of the impact of Hunzeker's amendment of the death certificate on the court's evaluation of the relevant evidence in considering whether there was probable cause to issue a warrant for Garcia's arrest.  *See Dorsey,* 2025 WL 1125565, at *3 ("[A]llegations that an officer 'prevaricate[d] and distort[ed] evidence' or supplied 'false statements' that caused a 'magistrate to issue a warrant' are sufficient to allege personal participation in a § 1983 malicious-prosecution violation.").

Accordingly, the Court finds that Garcia has plausibly alleged that Hunzeker caused his prosecution, as is required to state a claim for malicious prosecution.

2.    <u>Clearly Established Law</u>

Hunzeker also argues that Garcia's malicious prosecution claim against him is subject to dismissal for the independent reason that, "[e]ven viewing Plaintiff's allegations as true, Plaintiff cannot point to a case that has held that Mr. Hunzeker's alleged action of changing the manner of death on Ms. Jones' death certificate violated a clearly established right."  (ECF No. 53 at 13.)  The Court disagrees.

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the

42

right must be as the plaintiff maintains." *Thomas,* 765 F.3d at 1194.  Thus, "the

contours of the right must be sufficiently clear [so] that a reasonable official would

understand that what he is doing violates that right." *Id.*  The Court's analysis, however,

"is not a scavenger hunt for prior cases with precisely the same facts, and a prior case

need not be exactly parallel to the conduct here for the officials to have been on notice

of clearly established law." *Reavis v. Frost,* 967 F.3d 978, 992 (10th Cir. 2020) (internal

quotation marks omitted).  There can also be "the rare obvious case, where the

unlawfulness of the officer's conduct is sufficiently clear even though existing precedent

does not address similar circumstances." *D.C. v. Wesby,* --- U.S. ---, 138 S. Ct. 577,

590 (2018) (internal quotation marks omitted).

In *Pierce,* the Tenth Circuit held "that the prohibition on falsification or omission of

evidence, knowingly or with reckless disregard for the truth, was firmly established as of

1986, in the context of information supplied to support a warrant for arrest."  359 F.3d at

1298.  Hunzeker makes much ado of the fact that Garcia has not identified a Supreme

Court or Tenth Circuit case specifically holding that a county coroner violates a clearly

established Fourth Amendment right "by amending the death certificate."  (ECF No. 53

at 12.)  But like the forensic analyst in *Pierce,* Hunzeker "overemphasizes the degree of

specificity required of prior case to clearly establish the law."  359 F.3d at 1298.  The

Court sees little material difference between a forensic analyst who, "with knowing and

reckless disregard for the truth, inform[s] the police and prosecutorial authorities that

hair analysis support[s] [the defendant's] involvement in [a] rape—even though in fact,

far from implicating him in the rape, the hair analysis tend[s] to exonerate him—",

*Pierce,* 359 F.3d at 1293–94, and a county coroner who, five years after someone's

43

death, "file[s] an amendment . . . to change [the decedent's] manner of death . . . from

'suicide' to 'could not be determined'" to "cause [the defendant] to be prosecuted" for

homicide, "despite having no new evidence" to "call into question the [prior] coroner's

conclusion that [the decedent] had died by suicide with no involvement from [the

defendant]," (ECF No. 33 at ¶¶ 42, 61).

Hunzeker also cites two authorities he contends support the *absence* of clearly

established law concerning when a coroner violates a plaintiff's constitutional rights.

But neither case appears to have involved a malicious prosecution claim, nor even an

alleged violation of the § 1983 plaintiff's Fourth Amendment rights.  Rather, in *Harner v.*

*Hibbard,* the plaintiff alleged the county coroner "intentionally caused the destruction of

a section of the aorta of the body of [her husband], taken during an autopsy, showing a

perforation and crucial evidence in a wrong death action claiming negligence in

conducting a cardiac catheterization."  2013 U.S. Dist. LEXIS 86790, at *1 (D. Colo.

June 20, 2013).  The district court concluded the plaintiff "failed to present established

legal authority" to support her claim that the coroner violated her "constitutional right of

access to the courts" where prior Tenth Circuit authority established "that the protection

is for the opportunity to initiate legal action."  *Id.* at *1–2.

Similarly, in *Afola v. Corrections Corporation of America,* the district court found

the plaintiff had failed to plausibly allege a claim for § 1983 conspiracy—seemingly also

based on an alleged destruction of evidence that the decedent's estate and mother

argued deprived them of right of access to the courts—where the allegations in the

complaint, taken as true, indicated the coroner was "simply repeating the findings made

by the pathologist" who "had actually performed the autopsy."  2013 U.S. Dist. LEXIS

44

81180, at \*13–14 (D. Colo. June 10, 2013).  The court notably commented "it [was] difficult to understand how [the coroner] could legitimately include a cause of death on the death certificate different from the cause determined by [the pathologist] who, again, had actually performed the autopsy and who allegedly also refused to change the cause of death from cardiac hypertrophy due to hypertension."  *Id.*  Hunzeker is alleged to have done precisely opposite here by changing the manner of Jones' death when the coroner who actually performed the autopsy consistently refused to do so.

In sum, given the disparate facts and claims at issue, the Court finds neither authority instructive in this case.

Accordingly, Hunzeker's Motion is denied to the extent he seeks dismissal of Garcia's malicious prosecution claim based on qualified immunity.

**B.    Conspiracy**

1.    <u>Constitutional Violation</u>

Hunzeker next moves to dismiss Garcia's claim that he participated in a § 1983 conspiracy.  (ECF No. 53 at 9.)

A § 1983 conspiracy claim is "a conspiracy to deprive plaintiff of a constitutional or federally protected right under color of state law."  *Dixon v. City of Lawton,* 898 F.2d 1443, 1449 n.6 (10th Cir. 1990).  "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy."  *Id.*  "Conclusory allegations of conspiracy, however, are insufficient to state a valid § 1983 claim."  *Bledsoe v. Carreno,* 53 F.4th 589, 609 (10th Cir. 2022).

To state a § 1983 conspiracy claim, a plaintiff must "allege 'specific facts showing an agreement and concerted action among defendants,'—an 'agreement upon a

45

common, unconstitutional goal,' and 'concerted action' taken 'to advance that goal.'"

*Bledsoe,* 53 F.4th at 609 (first quoting *Tonkovich,* 159 F.3d at 533, then quoting *Janny*

*v. Gamez,* 8 F.4th 883, 919 (10th Cir. 2021) (internal citation and quotation marks

omitted)).   Nevertheless, "because '[d]irect evidence of an agreement to join a . . .

conspiracy is rare, . . . a defendant's assent can be inferred from acts furthering the

conspiracy's purpose."  *Edmonson,* 962 F.2d at 1548 (internal citation and quotation

marks omitted).   "An express agreement is consequently unnecessary."  *Bledsoe,* 53

F.4th at 609.   Moreover, while "[t]he participants in the conspiracy must share the

general conspiratorial objective," "they need not know all the details of the plan

designed to achieve the objective or possess the same motives for desiring the

intended conspiratorial result."  *Frasier,* 992 F.3d at 1024 (internal citation and quotation

marks omitted).

Here, Garcia alleges that, "on October 25, 2019, Defendants Martinez and

Rosecrans met with Defendant Hunzeker in order to convince him to change the

manner of death on Ms. Jones' death certificate from suicide to homicide."  (ECF No. 70

at ¶ 62.)  Though he initially refused, the SAC alleges that, less than a month later, he

"filed an amendment with the State of Colorado to change Ms. Jones' manner of death

on her death certificate from 'suicide' to 'could not be determined,'" "[k]nowing that his

actions would cause Mr. Garcia's prosecution."  (*Id.* at ¶ 64.)  Garcia alleges that, in this

way, "Defendant Hunzeker acted in concert with Defendant Martinez and Defendant

Rosecrans . . . as part of a broader conspiratorial objective of prosecuting Mr. Garcia

despite there being a lack of evidence, and probable cause, to do so," (ECF No. 70 at ¶

67), "to appease the rich, powerful, and influential family of Ms. Jones who wished to

46

see Mr. Garcia prosecuted for her suicide," (*id.* at ¶ 69).  It bears mention that the SAC

also alleges that members of Jones' family also directly approached Hunzeker "multiple

times" to similarly demand he change the manner of death on Jones' death certificate

(*id.* at ¶¶ 60–61), and that he had certain financial conflicts of interest, including that "he

had been paid by Ms. Jones' family for Ms. Jones' funeral services," (*id.* at ¶ 61).  These

allegations plausibly support Hunzeker's participation in a conspiracy to prosecute

Garcia in contravention with his Fourth Amendment rights.

Hunzeker stresses the fact that the FAC alleges he only amended the death

certificate after he "caved" to "intense pressure" from other parties.  (ECF No. 33 at 56–

61.)  As the Court understands it, Hunzeker believes such allegations are insufficient to

demonstrate a meeting of the minds to deprive Garcia of his rights.  (ECF No. 53 at 9–

10.)  As the Court noted above, however, Garcia need not allege an "express

agreement" to establish a § 1983 conspiracy.  *Bledsoe,* 53 F.4th at 609.  The Court can

infer Hunzeker's assent "from acts furthering the conspiracy's purpose"—here,

amending Jones' death certificate—notwithstanding his earlier resistance to doing so.

*Edmonson,* 962 F.2d at 1548.

For these reasons, the Court finds Garcia has plausibly alleged Hunzeker's

participation in a § 1983 conspiracy.

2.    Clearly Established Law

Hunzeker's argument that Garcia "has not alleged a violation of any clearly

established rights that could give rise to a conspiracy claim" appears to merely be a

repetition of his arguments regarding the sufficiency of Garcia's allegations.  (*See* ECF

No. 14–15.)  In any case, "a § 1983 conspiracy claim for using fabricated or false

evidence was clearly established well before 1999." *Bledsoe,,* 53 F.4th at 609 (citing

47

*Anthony v. Baker,* 767 F.2d 657, 662 (10th Cir. 1985) (recognizing that "state and federal officers are liable under § 1983 . . . when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction").

Accordingly, Hunzeker's Motion is also denied to the extent he seeks dismissal of Garcia's § 1983 conspiracy claim based on qualified immunity.

## VI. DEFENDANTS EIKELENBLOOM-SCHIEVELD AND EIKELENBLOOM'S MOTION TO DISMISS

Garcia also asserts two claims against Defendants Eikelenbloom-Schieveld and Eikelenbloom under § 1983 for malicious prosecution and conspiracy. Defendants Eikelenbloom-Schieveld and Eikelenbloom move to dismiss only the malicious prosecution claim.

As a threshold matter, Garcia argues that "[t]he conclusory nature of Defendants Eikelenbloom and Eikelenbloom-Schieveld's arguments constitutes an independent and sufficient basis for this Court to deny their motion to dismiss." (ECF No. 86 at 2.) His point is well-taken. Nevertheless, the Court will briefly consider Eikelenbloom and Eikelenbloom-Schieveld's arguments below.

### A.    Malicious Prosecution

To reiterate, to establish a malicious prosecution claim, Garcia must show "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Margheim,* 855 F.3d at 1082.

48

Eikelenbloom-Schieveld and Eikelenbloom contend that Garcia has failed to plausibly allege all but the second element.

    1.    <u>Causation</u>

The entirety of Eikelenbloom-Schieveld and Eikelenbloom's argument as to causation is that

> the Complaint fails to allege that either Selma Eikelenbloom-Schieveld or Richard Eikelenbloom commenced or directed the prior prosecution.  Prosecutors and law enforcement officials, not contracted experts, made the independent decision to prosecute.  This breaks the causal chain required for liability.

(ECF No. 80 at 2.)

Contrary to Eikelenbloom-Schieveld and Eikelenbloom's argument, the Tenth Circuit has held that a forensic analyst who "provided several false oral and written reports and withheld exculpatory evidence from the [police department] and the District Attorney's Office," which "became an inseparable basis for the charges against [the § 1983 plaintiff' and the District Attorney's decision to proceed to trial," could not "hide behind the fact that she neither initiated nor filed the charges against [the § 1983 plaintiff]." *Pierce,* 359 F.3d at 1292–93.  Moreover, though the forensic chemist under scrutiny in *Pierce* was employed by a police department, *id.* at 1281, federal courts have extended the same rationale to the conduct of forensic experts contracted by the State to assist with criminal investigations.[1] *E.g., Davis-Guider,* 2019 WL 1101278, at *1, *4 (at dismissal stage, sustaining malicious prosecution claim against defendant "who had a contract with [the defendant county] to conduct forensic investigations and prepare autopsy results" where the § 1983 plaintiff alleged the examiner "ignored evidence that contradicted his findings, omitted key information from his autopsy report, improperly

documented that V.D.'s cause of death was homicide, and that his report was the only evidence used to support the decision to prosecute").[11]

Similar to the allegations in the foregoing authorities, Garcia alleges here that Eikelenbloom-Schieveld and Eikelenbloom "worked with" Rosecrans and Martinez "to purposefully produce an unscientific, non-credible autopsy" and "shoddy forensic report" that they "engineered . . . from the beginning to find that Ms. Jones died by homicide, despite all objective evidence to the contrary." (ECF No. 70 at ¶¶ 50–51.) According to the SAC, that autopsy report was then presented to the prosector to "convince him to initiate charges against Mr. Garcia." (*Id.* at ¶ 50.) The autopsy and forensic report were also used "in Defendant Martinez's later affidavit that was submitted by him to the Court to ensure that Mr. Garcia was prosecuted." (*Id.* at ¶ 55.) These allegations plausibly allege that Eikelenbloom-Schieveld and Eikelenbloom caused Garcia's criminal prosecution.

Nevertheless, Eikelenbloom-Schieveld and Eikelenbloom cite *Miller v. Spiers* for the proposition "that expert witnesses retained by law enforcement are not liable for malicious prosecution because they do not control the decision to prosecute." 339 F. App'x 862, 867 (10th Cir. 2009). Indeed, they quote the Tenth Circuit as stating therein that "the decision to prosecute rests with the prosecutor, not with witnesses or

---

[11] *See also Burke v. Town of Walpole,* 405 F.3d 66, 70, 88–93 (1st Cir. 2005) (forensic odontologist who worked "as an independent consultant to the [] County District Attorney's Office" could be liable for "render[ing] a bite mark opinion with deliberate falsity or reckless disregard for the truth," though ultimately finding the factual allegations against him were insufficient); *Moldowan v. City of Warren,* 578 F.3d 351, 365, 396–97 (6th Cir. 2009) (affirming that "forensic odontologist and consultant" to the county medical examiner's office and state police who offered expert testimony regarding bite marks "may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence").

50

consultants." (ECF No. 80 at 3.) The Court has identified no such quote in *Miller*.[12]

And though the § 1983 plaintiff alleged a forensic scientist "suppl[ied] false information

and omit[ed] critical details about the evidence linking [him] with [a] murder," 339 F.

App'x at 865, the primary issue was "whether Miller satisfied the favorable termination

element," *id.* at 867. The Tenth Circuit did not analyze whether the plaintiff sufficiently

alleged the forensic scientist caused his prosecution. Accordingly, *Miller* does not

change the Court's conclusion.

2.    Lack of Probable Cause

Eikelenbloom-Schieveld and Eikelenbloom next argue that "Plaintiff does not

allege specific facts showing why probable cause was absent." (ECF No. 80 at 2.) "On

the contrary," they continue, "the existence of warrants or charging decisions by

prosecutors confirms that probable cause was found." (*Id.* at 2-3.) They contend that,

"[w]ithout factual allegations to rebut that presumption, Plaintiff's claim cannot proceed."

(*Id.*)

Eikelenbloom-Schieveld and Eikelenbloom misstate the pertinent inquiry. "In the

case of a Fourth Amendment claim of falsified evidence, the existence of probable

cause is determined by setting aside the false information and reviewing the remaining

contents of the affidavit." *Pierce,* 359 F.3d at 1293. Put differently, the plaintiff

asserting malicious prosecution must show that the defendant's "falsification of

inculpatory evidence or suppression of exculpatory evidence was necessary to the

finding of probable cause: that without the falsified inculpatory evidence, or with the

---

[12] This quotation of non-existent language leaves the Court highly suspicious that counsel's citation to *Miller* is a product of the un-verified work of generative artificial intelligence. The Court will separately enter an order to show cause on this matter.

withheld exculpatory evidence, there would have been no probable cause for his continued confinement or prosecution." *Id.* at 1295.

Accordingly, here, where it is alleged that the warrant for Garcia's arrest and decision to charge him for homicide were predicated in significant part on Eikelenbloom-Schieveld and Eikelenbloom's fabricated autopsy and crime scene recreation reports, Garcia's malicious prosecution claim is subject to dismissal only if probable cause existed to arrest and prosecute Garcia for homicide regardless of their expert reports. Consistent therewith, Garcia repeatedly alleges that, absent the fabricated expert reports and amended death certificate, no probable cause supported his arrest and prosecution for homicide. (ECF No. 70 at ¶¶ 67, 69, 73, 74, 77, 80, 86.) Eikelenbloom and Eikelenbloom-Schieveld have not even endeavored to argue otherwise.

3.    Malice

Eikelenbloom-Schieveld and Eikelenbloom next contend that Garcia has failed to plausibly allege malice. The entirety of their argument consists of the following discussion:

> Malice cannot be inferred from bare legal conclusions. The Complaint alleges only that Selma Eikelenbloom-Schieveld and Richard Eikelenbloom acted with 'malice,' without factual support. Under *Iqbal* and *Twombly,* such conclusory allegations are insufficient to state a claim.

(ECF No. 80 at 3.)

"Malice may be inferred if a defendant causes the prosecution without arguable probable cause." *Stonecipher,* 759 F.3d at 1146. As discussed above, Garcia has plausibly alleged that Eikelenbloom-Schieveld and Eikelenbloom caused his prosecution by purposefully fabricating the autopsy and forensic reports, and there was otherwise no probable cause for his arrest and prosecution. The Court can thus infer

52

from the allegations in the SAC that Eikelenbloom-Schieveld and Eikelenbloom acted with malice.

### 4.    Damages

Eikelenbloom-Schieveld and Eikelenbloom next contend that

> Plaintiff broadly claims emotional distress and reputational harm but does not tie those alleged damages to any specific acts by Selma Eikelenbloom-Schieveld or Richard Eikelenbloom.  Because Defendants were not decision-makers and acted only in a limited consulting role, causation of Plaintiff's alleged injuries cannot be established.

(ECF No. 80 at 4.)  Garcia notably has not specifically responded to Eikelenbloom-Schieveld and Eikelenbloom's argument as to damages.  But, the Court notes in any case that Eikelenbloom-Schieveld and Eikelenbloom's argument as to lack of damages appears to be a repetition of their arguments as to lack of causation, which the Court has already addressed.  *Cf. Pierce,* 359 F.3d at 1297 (rejecting forensic analyst's arguments "on the requirement of damages" to the extent they were "based on a factual denial that she did anything wrong, . . . or a repetition of her argument regarding probable cause, which has already been addressed").

## B.    Absolute Testimonial Immunity

Eikelenbloom-Schieveld and Eikelenbloom also suggest that, as witnesses, they are absolutely immune from liability for malicious prosecution.  (ECF No. 80 at 3.)  Much of their argument on this subject again appears directed to the issue of causation, which the Court has already addressed.  However, Eikelenbloom-Schieveld and Eikelenbloom briefly cite *Rehberg v. Paulk,* 566 U.S. 356 (2012), for the proposition "that witnesses testifying in criminal proceedings are absolutely immune from suit for their testimony and related preparatory work."  (*Id.*)

"Witnesses, 'including public officials and private citizens,' are entitled to absolute testimonial immunity from civil suits for damages based upon their testimony." *Berryman v. Niceta,* 143 F.4th 1134, 1143 (10th Cir. 2025) (quoting *Snell v. Tunnell,* 920 F.2d 673, 686 (10th Cir. 1990)). "The Supreme Court has defined this immunity broadly, explaining that 'a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony.'" *Montoya v. Vigil,* 898 F.3d 1056, 1069 (10th Cir. 2018) (quoting *Rehberg,* 566 U.S. at 367). Thus, "when absolute testimonial immunity attaches, it bars *all* claims based on the witness's testimony—even if it is perjurious." *Berryman,* 143 F.4th at 1143 (emphasis in original).

"[A]s broad as *Rehberg's* language was," however, "the Supreme Court disclaimed any approach that would allow absolute testimonial immunity too broad a reach: 'we do not suggest,' the Court there said, 'that absolute immunity extends to *all* activity that a witness conducts outside of [trial].'" *Montoya,* 898 F.3d at 1069–70 (quoting *Rehberg,* 566 U.S. at 370 n.1). Rather, "[i]n applying absolute testimonial immunity for witnesses, '[t]he central focus . . . has been the nature of the judicial proceeding itself' and the function of the testifying witness, rather than the witness's identity or status." *Berryman,* 143 F.4th at 1143 (quoting *Briscoe v. LaHue,* 460 U.S. 325, 334 (1983)). "The more distant a [defendant's] function is from the judicial process, the less likely absolute immunity will attach." *Snell,* 920 F.2d at 687.

In *Rehberg,* the Supreme Court noted that "law enforcement officials who falsify affidavits, . . . and fabricate evidence concerning an unsolved crime" are accorded only qualified immunity. 566 U.S. at 370 n.1 (internal citations omitted). Eikelenbloom-Schieveld and Eikelenbloom have not developed any argument tending to support the

54

proposition that forensic experts who fabricate autopsy and crime scene recreation reports during the investigation of a crime—that basis of Garcia's crimes against them—should be viewed differently. *See Burns v. Reed,* 500 U.S. 478, 486 (1991) ("[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."). Accordingly, the Court declines to extend absolute witness immunity to Eikelenbloom-Schieveld and Eikelenbloom at this stage.

### VII. CONCLUSION

For all the reasons set forth above, the Court ORDERS as follows:

1.     Defendants City of Monte Vista, John Rosecrans, and Michael Martinez's Partial Motion to Dismiss (ECF No. 45) is GRANTED IN PART and DENIED IN PART as follows:

   a.     Garcia's *Monell* claim against the City is DISMISSED WITHOUT PREJUDICE to the extent it is based on an alleged informal custom amounting to a widespread practice, or a final policymaker's alleged ratification of the contents of the arrest affidavit authored by Martinez;

   b.     Garcia's *Monell* claim against the City is DISMISSED WITH PREJUDICE to the extent it is based on an alleged failure to train or supervise;

   c.     The Monte Vista Defendants' Partial Motion to Dismiss (ECF No. 45) is DENIED in all other respects.

2.     Defendant Robert Willet's Motion to Dismiss (ECF No. 51) is GRANTED and the malicious prosecution and conspiracy claims asserted against him in the SAC are DISMISSED WITHOUT PREJUDICE;

3.      Defendant Stephen Hunzeker's Motion to Dismiss (ECF No. 53) is

DENIED; and

4.      Defendants Selma Eikelenboom-Schieveld and Richard Eikelenboom's

Motion to Dismiss (ECF No. 80) is DENIED.

5.      To the extent Plaintiff believes he has a good faith, factual basis to do so,

he is GRANTED leave to file a further, and FINAL, amended complaint by no later than

**June 30, 2026**.  Any amended allegations in such further amended complaint shall be

strictly limited ONLY to those claims the Court in this Order is dismissing WITHOUT

PREJUDICE.


Dated this 29th day of May, 2026.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge